[No. B106910. Second Dist., Div. Four. Dec. 3, 1999.]

VIBEKE CLOUD, Plaintiff and Appellant, v.
JOSEPH T. CASEY et al., Defendants and Respondents

[No. B118968. Second Dist., Div. Four. Dec. 3, 1999.]

VIBEKE CLOUD, Plaintiff and Appellant, v.
WESTERN ATLAS, INC., et al., Defendants and Appellants.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, V and VII.

**COUNSEL**

Peter R. Dion-Kindem; Gronemeier & Barker, Gronemeier & Associates and Dale L. Gronemeier for Plaintiff and Appellant.

Paul, Hastings, Janofsky & Walker and Nancy L. Abell for Defendant and Appellant Western Atlas, Inc.

Paul, Hastings, Janofsky & Walker, Nancy L. Abell and Leslie L. Abbott for Defendants and Respondents Alton J. Brann, Joseph T. Casey and Charles A. Cusumano.

**OPINION**

**EPSTEIN, J.**—Vibeke Cloud brought this employment discrimination action against her employers Western Atlas, Inc., and its parent company,

Litton Industries, Inc., and against three individual supervisors of these corporations. The individuals were dismissed on summary judgment. Ms. Cloud prevailed against the corporations in a jury trial. She appeals from the grant of summary judgment for the individuals. She argues that several pretrial rulings improperly limited her damages. She also appeals from the trial court's granting of a defense motion for judgment notwithstanding the verdict as to the jury's determination that she was entitled to punitive damages. The corporations appeal from the judgment against them, and from the award of attorney's fees. In the published portion of the opinion, we conclude that the trial court correctly granted summary adjudication against Ms. Cloud on her cause of action based on constructive discharge, but that it erred in limiting her damages to the date she resigned from Western Atlas and in granting judgment notwithstanding the verdict on punitive damages. We remand for determination of compensatory and punitive damages. In all other respects, we affirm the judgments.

FACTUAL AND PROCEDURAL SUMMARY

Ms. Cloud began work for Litton in June 1981 as a senior accountant. Her responsibilities and salary increased steadily, and by November 1987, she was director of financial consolidations. It was about that time that she was asked about her goals by then senior vice-president and controller, Wayne Grosvenor. When she told him her eventual goal was to become controller of Litton, he told her that would not happen because the chief financial officer, Joseph T. Casey, "will not stand for a woman in that position."

In December 1988, Ms. Cloud applied to become Litton's assistant controller, but a man was given the position instead. According to Ms. Cloud, she asked Mr. Grosvenor what skills she needed to be considered for the position of assistant controller. He responded that she was fully qualified, but that the corporation did not see a woman in that position.

Ms. Cloud continued as director of financial consolidations, and was given increased responsibilities and a corresponding increase in compensation. According to Ms. Cloud, controller Rudolph Lang told her that as far as he was concerned, she was the "chief accounting officer." Despite that, Ms. Cloud was excluded from operating and planning meetings, and from most meetings with Litton's outside advisers and business organizations.

From 1992 to 1994, Ms. Cloud was involved in the planning and implementation of the spin-off of one of Litton's business units into a separate corporation that became known as Western Atlas, Inc. Ms. Cloud sought the position of controller of this new corporation, but in June 1993, it was given

to a male employee, Charles A. Cusumano. When she learned that she would not get the position, Ms. Cloud stated her objections to Alton J. Brann, chairman and chief executive officer of Western Atlas. Mr. Brann told Ms. Cloud that she was considered "too tough." Ms. Cloud also discussed the situation with Joseph Casey, who had become chief financial officer of Western Atlas. According to Ms. Cloud, Mr. Casey told her she had not been considered for the controller position because she did not have operating experience. Ms. Cloud was offered the position of assistant controller. She was urged to try that position, and if it was not acceptable, she was assured that other opportunities would be made available to her.

Ms. Cloud worked in the assistant controller position during the transition period until Western Atlas became an independent company in March 1994. Despite Mr. Casey's assurances that she would be given other opportunities if she were unhappy in that position, Ms. Cloud received no offer she considered suitable.

Ms. Cloud submitted her resignation to Western Atlas in March 1994, effective May 6, 1994. In her exit interview, she indicated that her major reason for leaving Western Atlas was the "Lack of upward mobility and recognition." Ms. Cloud then entered into a six-month consulting agreement with Western Atlas to provide accounting services as needed, including work on special projects of a financial nature. This agreement was terminated by Western Atlas on June 29, 1994, after Ms. Cloud notified that company that she believed she had been the victim of gender discrimination by Litton, Western Atlas, and individual employees Alton Brann, Joseph Casey, and Charles Cusumano.

After exhausting her administrative remedies, Ms. Cloud filed this action against Litton and Western Atlas (the corporations), and Mr. Brann, Mr. Casey and Mr. Cusumano (the individual defendants). In it, she alleged that she had been denied the controller position at Western Atlas based on gender discrimination, that she had been constructively discharged, and that the termination of her consulting agreement was in retaliation for her filing claims under the Fair Employment and Housing Act (FEHA).

The individual defendants moved for summary judgment, which was granted. The corporations moved for summary adjudication of 15 specified issues. The trial court granted summary adjudication in part, ruling that Ms. Cloud's retaliation, constitutional, and public policy claims based on termination of her consulting agreement were barred by the arbitration provision

in that agreement, and that the undisputed facts established as a matter of law that Ms. Cloud's resignation was not a constructive discharge. The corporations had sought an adjudication that Ms. Cloud was not entitled to any backpay or front pay following her last day of employment with Western Atlas because she failed to establish a constructive discharge. The court denied summary adjudication on the damages issue "because it is vague."

Before trial, the corporations brought a motion *in limine* seeking to exclude all evidence and argument "pertaining to any claim for pay damages for any period following her resignation from Western Atlas Inc. on May 20, 1994." The trial court granted this motion. In light of that ruling, the parties agreed to bifurcate the liability and damages phases of the trial, with the jury hearing only the liability phase. The parties also agreed that the court would make findings as to damages based on the restriction imposed by the granting of the *in limine* motion, and also would make an advisory finding as to the amount of damages to which Ms. Cloud would be entitled without the restriction.

The jury returned a verdict finding that Western Atlas had discriminated against Ms. Cloud on the basis of gender, and that Litton had aided and abetted in the unlawful discrimination. It also found that the corporations had engaged in despicable conduct or acted maliciously or oppressively in intentionally discriminating against Ms. Cloud. The trial court denied the corporations' motion for judgment notwithstanding the verdict as to liability, but granted their motion as to the punitive damages finding.

The damages phase was tried to the court. The court awarded judgment to Ms. Cloud of $7,235 in compensatory damages; $1,696 in prejudgment interest; $20,114 in costs; and $400,819 in attorney's fees. Pursuant to the parties' stipulation, the court made an alternative finding that if Ms. Cloud were entitled to postresignation damages, her damages, calculated to the date of her mandatory retirement at age 65, would be $603,496 in lost earnings and benefits, and $276,131 in lost stock options.

Ms. Cloud appeals from the summary judgment in favor of the individual defendants (No. B106910), and from the judgment as to the corporations (No. B118968). The corporations appeal from the judgment against them. At the request of the parties, we have consolidated the appeals. The issues raised involve determinations made before, during, and after trial. We discuss them in that procedural sequence.

## Discussion

### I

### *Constructive Discharge*

The trial court granted summary adjudication for the corporations, and summary judgment for the individuals, as to Ms. Cloud's claim for constructive discharge. The court explained in its order: "There are no disputed issues of material fact regarding this claim. The undisputed facts establish that as a matter of law plaintiff's resignation was not a constructive termination in that the conditions of employment were not so intolerable that a reasonable person in her position would have resigned." Ms. Cloud claims the court erred in this ruling.

■ "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244-1245 [32 Cal.Rptr.2d 223, 876 P.2d 1022].)

To be deemed a constructive discharge, an employer must create or permit working conditions so intolerable or aggravated that a reasonable person in the employee's position would feel compelled to resign. (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1247.) The conditions giving rise to an employee's resignation "must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Id.* at p. 1246.)

In *Turner*, the Supreme Court clarified the elements of constructive discharge: "In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (7 Cal.4th at p. 1251.)

"In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern'

before the situation will be deemed intolerable. In general, '[s]ingle, trivial, or isolated acts of [misconduct] are insufficient' to support a constructive discharge claim. [Citation.] Moreover, a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1247, fns. omitted.)

▮ Defendants' motions asserted Ms. Cloud had not been constructively discharged as a matter of law because her articulated reason for terminating her employment with Western Atlas was that she had not been named controller of the company, and denial of a promotion will not support a finding of constructive discharge. They also argued that Ms. Cloud's resignation, coming nine months after the triggering event, was too remote to have been caused by it.

Contrary to defendants' assertion, while Ms. Cloud's claim of constructive discharge climaxed with the denial of the controller position, she relied on a chain of events occurring over a six-year period which led up to that event. This is appropriate for a constructive discharge claim, where one consideration is whether the adverse conditions amount to a continuous pattern rendering the situation intolerable. (See *Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1247.) But even if we resolve all of the factual issues in her favor, we agree with the trial court's conclusion that they do not establish that Ms. Cloud's working conditions were so aggravated or intolerable that a reasonable person in her position would be compelled to resign. (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1251.)

The events upon which Ms. Cloud relied, as set out in her opposition to summary judgment, began in December 1988, when she was not selected for the position of assistant controller of Litton. Ms. Cloud protested this nonselection, and on other occasions stated that there appeared to be gender discrimination at Litton. Management expressed no disagreement with Ms. Cloud's observation. Instead, Ms. Cloud was told that Litton had not had a woman in a top position, and that Litton's chief financial officer, Joseph Casey, did not "see a woman" in the controller's position.

Ms. Cloud was excluded from operating meetings, which deprived her of the operational experience later cited as a necessity for the controller position. This action, too, she attributed to gender discrimination. When she complained about it, the controller told her the decision as to who would attend the meetings was made by Mr. Casey.

The pivotal event occurred in June 1993, when Ms. Cloud was not selected to become the controller for the spin-off corporation, Western Atlas.

She complained to Western Atlas's chairman, Mr. Brann, asserting that she had not been fairly considered for the position, and that this was another instance of gender discrimination. Mr. Brann acknowledged that could be true. He told Ms. Cloud that she had a reputation for being too tough and working her people too hard.

Ms. Cloud also talked to Mr. Casey about the possibility that she was not selected as controller based on gender discrimination. Mr. Casey did not disagree. Ms. Cloud told Mr. Casey, " 'I have been told time and again that I can't advance to the Controllership because I'm a woman.' " His answer was, " 'Well, we haven't had women in that position.' "

Ms. Cloud was asked to take the position of assistant controller for Western Atlas. She was unhappy about the reporting status of that position. She had been reporting directly to Mr. Casey while working on the spin-off, and the assistant controller position reported to the controller, thereby lowering her reporting status. Mr. Casey urged Ms. Cloud to try the position because the company needed her help to complete the spin-off. He told her that if it was not what she wanted, they would work out something else for her.

In the next few months, Ms. Cloud asked Mr. Casey about job opportunities other than assistant controller, but none was offered to her. Finally, in March 1994, when the spin-off was completed, Ms. Cloud handed Mr. Casey her resignation. He asked her to reconsider. He spoke with her again a short time later, and offered her the position of staff vice-president. That position also reported to the controller. Ms. Cloud asked Mr. Casey to change the reporting structure, but he would not. She would have been open to staying at Western Atlas, and would have accepted any promotion or even a lateral move, as long as the position formally reported directly to Mr. Casey. None was offered to her.

Ms. Cloud found the situation "incredibly frustrating. I had done everything I could and I was being criticized for being too capable, and there wasn't anywhere to turn, there was no point in staying. It was not tolerable." At that point, she resigned from Western Atlas.

Ms. Cloud presents more detail as to these events, and recounts several conversations with others in which they discussed the existence of gender discrimination by defendants against her and other women. While this evidence, if credited, supports a determination that Ms. Cloud was the victim of gender discrimination, it does not establish that she was constructively discharged. Ms. Cloud acknowledges that she was given enormous responsibility, and that she was paid in accordance with the work she performed. In

1993, the last full year she worked for the corporations, she was paid $237,000 in salary and bonus. What she was not given was the position of controller, or any other position reporting directly to the chief financial officer rather than to the controller. Her willingness to stay with Western Atlas so long as she reported to the very person who discriminated against her strongly supports the inference that the employment conditions were not so intolerable that a reasonable person would have to resign. This was not a demotion, but a lack of a promotion[1] to a position for which Ms. Cloud was qualified. (See *Lee* v. *Bank of America* (1994) 27 Cal.App.4th 197, 213 [32 Cal.Rptr.2d 388] [difference in pay, responsibility, conditions and prestige when demoted from branch manager to assistant branch manager not "so great that going from the former to the latter even comes close to being 'intolerable.'"].)

Gender discrimination in employment is unlawful, and actionable. The question here, however, is not whether there was such discrimination, but whether the discriminatory working conditions were so extreme as to coerce a reasonable employee to resign, thereby constituting a constructive discharge. Under the objective test set out in *Turner*, the working conditions described by Ms. Cloud were not "so intolerable or aggravated . . . that a reasonable person in the employee's position would be compelled to resign." (7 Cal.4th at p. 1251.) The trial court correctly ruled that Ms. Cloud's resignation was not a constructive discharge as a matter of law.

## II, III.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## IV

### *Compensatory Damages*

Ms. Cloud claims the court erred in granting the corporations' motion precluding her from presenting evidence of postresignation damages. Initially, she argues that the *in limine* motion was just a "thinly disguised" renewed motion for summary adjudication on this issue. We disagree.

Defendants sought summary adjudication of this issue. At the hearing on the motion, the court indicated it was inclined to leave the damages issue for later determination to avoid partial summary adjudication on the issue of damages. The court explained that it was concerned about its authority to

---

[1]See footnote 2, *post.*

*See footnote, *ante,* page 895.

adjudicate a single item of compensatory damage that does not dispose of an entire cause of action. The court mentioned a Court of Appeal decision filed just one week before—presumably *DeCastro West Chodorow & Burns, Inc. v. Superior Court* (1996) 47 Cal.App.4th 410, 422 [54 Cal.Rptr.2d 792]—that so held. We shall assume, without deciding, the correctness of that appellate holding, and turn to the merits of the trial court's *in limine* ruling.

As the parties acknowledge, effective remedies under FEHA should be fashioned so as to make the individual whole. (See *Ackerman v. Western Elec. Co., Inc.* (N.D.Cal. 1986) 643 F.Supp. 836, 852 ["Where unlawful discrimination is proven, the goal of the remedies under the [FEHA] is to restore plaintiff as nearly as possible to the position or status she would have enjoyed but for the defendant's wrongful conduct."]; Cal. Code Regs., tit. 2, § 7286.9.)

Defendants urged the trial court to limit Ms. Cloud's backpay damages to the period between her nonselection as controller and her resignation. Under that approach, which has been applied by many federal courts, an employee who has been discriminatorily denied promotion is precluded from recovering backpay for any period after the date of his or her voluntary resignation *unless* the employee was constructively discharged. (See *Satterwhite v. Smith* (9th Cir. 1984) 744 F.2d 1380, 1381, fn. 1.) In light of the court's determination, which we affirm, that Ms. Cloud was not constructively discharged, application of this rule would severely limit her damages.

Neither side has cited, nor have we found, any California state court case applying the rule to limit a FEHA plaintiff's damages. But defendants argue that 10 of the 11 federal circuits that have considered the point have applied the doctrine to limit damages in employment discrimination cases. (See, e.g., *Jurgens v. E.E.O.C.* (5th Cir. 1990) 903 F.2d 386, 389; *Maney v. Brinkley Mun. Waterworks and Sewer Dept.* (8th Cir. 1986) 802 F.2d 1073, 1076.) The rationale for this rule was explained in *Thorne v. City of El Segundo* (9th Cir. 1986) 802 F.2d 1131, 1134: "An employee, faced with an obstacle in the logical progression and development of a career should not quit at the first sign of institutional discrimination. Restricting backpay awards encourages the employee to work with supervisors within the existing job setting and employment relationship in an effort to overcome resistance within that workplace and to eradicate the discrimination."

Not surprisingly, exceptions to this strict limitation of damages have developed. For example, in *Thorne* the court found that the backpay restriction does not apply if the employee was seeking an entirely new type of career with the employer, rather than a promotion in the same line of work.

Where a new type of career was sought, the court considered the discriminatory employment action more akin to a refusal to hire than to a failure to promote, and for that reason the backpay remedy was not restricted to the period up to the date of the employee's voluntary resignation. (802 F.2d at pp. 1134-1135; see also *Odima* v. *Westin Tucson Hotel* (9th Cir. 1995) 53 F.3d 1484, 1496.)

The *Thorne* court noted the different method of computing damages in a refusal to hire case: "[W]hen an employer has refused to hire an employee in violation of that employee's rights under Title VII, the court should compute the backpay award from the date of the discriminatory act until the date of final judgment. . . . [¶] Our court has recognized, however, that the backpay period may terminate earlier if the plaintiff has voluntarily removed herself from the job market, [citations], or rejected the employer's unqualified offer of reinstatement to the position to which the plaintiff applied, [citations]." (802 F.2d at pp. 1136-1137.) But where the employee rejects an offer of reinstatement due to excessive hostility of the management or the workplace, the award should extend to the date of the final judgment, and not terminate with the offer of reinstatement. (*Id.* at p. 1137.) The court remanded the case to the district court for determination of backpay entitlement in accordance with these standards.

The plaintiff in *Thorne* also sought "front pay," representing the amount she would have earned over her estimated career in the position she was denied. The court explained that "[a]wards of front pay are appropriate when it is impossible to reinstate the plaintiff or when it would be inappropriate due to excessive hostility or antagonism between the parties." (802 F.2d at p. 1137.) On remand, the district court was instructed to make findings on the issue of excessive hostility as a basis for determining the plaintiff's right to front pay. (*Ibid.*)

In *Helbling* v. *Unclaimed Salvage & Freight Co., Inc.* (E.D.Pa. 1980) 489 F.Supp. 956, a woman was denied promotion to the position of store manager on the basis of gender. She left her position as assistant manager as a result of disagreements with the man who was hired as manager. The store subsequently closed, so reinstatement was not an available remedy for the plaintiff. The court refused to limit the plaintiff's damages to the date she left defendant's employment because there was a causal connection between the discriminatory promotion decision and the plaintiff's decision to leave. The court held that the plaintiff was entitled to a backpay award from the date she should have been promoted to manager to the date the store closed, "the period it can be assumed she would have held the job to which she was entitled." (*Id.* at p. 963.)

Particularly relevant to our case is the treatment of the damages restriction in *Nobler* v. *Beth Israel Medical Center* (S.D.N.Y. 1989) 715 F.Supp. 570. In *Nobler*, a medical center employee who was passed over for appointment to the position of director of radiation therapy resigned his position and brought an action for constructive discharge and age discrimination. In that case, as in ours, summary judgment was granted to the defendant on the constructive discharge claim. The court denied the defendant's motion to dismiss the employee's claim for backpay and front pay based on application of the constructive discharge doctrine. The court identified two policies which underlie an award of damages in cases alleging discrimination in promotion: "First, the employee who has been unlawfully discriminated against by his or her employer . . . should be made whole. . . . Second, the employee should remain on the job and attack the alleged discrimination from within the context of the employment relationship in order to give the employer an opportunity to ameliorate the effects of the discrimination." (715 F.Supp. at p. 571.)

The court found the second policy—of encouraging an employee to fight from within the job—inapplicable to the facts before it. "[T]he policy of encouraging solutions within the context of the working relationship makes sense only when a possible solution exists. Given the uniqueness of the position sought by Nobler, there was no possible solution after Nobler was passed over." (*Nobler* v. *Beth Israel Medical Center, supra*, 715 F.Supp. at p. 572.) For this reason, the court held that if Nobler was able to prove his claim of unlawful age discrimination in his nonselection for the position as director of radiation therapy, he would be entitled to backpay from the date the new director began work to the date of judgment in the case. (*Id.* at p. 573.) Following settled Second Circuit law, the court left open the possibility that Nobler would be entitled to an award of front pay. (See *Whittlesey* v. *Union Carbide Corp.* (2d Cir. 1984) 742 F.2d 724, 728.)

We agree with the *Nobler* court that where resolution of the discrimination from within the working relationship is not a viable option, there is no reason to require an employee to stay on the job or forfeit a right to postresignation damages. For this reason, we decline to adopt a rule that would strictly limit backpay and front pay damages in cases where there is a failure to promote.[2]

In *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211, 221 [185 Cal.Rptr. 270, 649 P.2d 912], the California Supreme Court

---

[2]Because we reject the rule strictly limiting damages where an employee has not been constructively discharged, we need not consider Ms. Cloud's claim that the court erred in concluding that this was a failure to promote case rather than a failure to hire case. Either way, if the adverse employment action is based on unlawful discrimination, the employee is entitled to be made whole.

held that ". . . in a civil action under the FEHA, all relief generally available in noncontractual actions, including punitive damages, may be obtained." Civil Code section 3333 sets out the available relief: "For the breach of an obligation not arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate *for all the detriment proximately caused* thereby, whether it could have been anticipated or not." (Italics added.) California courts are authorized to award to a victim of employment discrimination all damages necessary to make the victim whole. Blind obedience to the limitation on postresignation damages developed in the federal courts does not serve that purpose.

Ms. Cloud is in a position similar to that of the plaintiff in the *Nobler* case. There was just one available position as controller at Western Atlas. When, on the basis of gender, Ms. Cloud was not selected for that position, she could not be "made whole" by staying at Western Atlas. The promotion to which she was entitled was not available. Nor were defendants willing to offer her any other position with similar status. Ms. Cloud was damaged not just in compensation and benefits, but also in executive status.

An employee in that position faces difficult choices. Ms. Cloud could have remained at Western Atlas in the assistant controller position and awaited an opening. The evidence at trial was that Mr. Casey was scheduled to retire in about two years, and when his position was filled, there might again be an opening for controller. But there was no certainty that Ms. Cloud would receive the position at that point or at any time. Moreover, an additional two years as assistant controller could further reduce her potential marketability elsewhere, thereby limiting her career prospects. Whether she stayed or left, Ms. Cloud faced risks, and continuing harm.

Limiting Ms. Cloud's damages to the pay differential up to the date she terminated her employment ignores the continuing harm that may flow from the denial of promotion where prompt placement in the denied position is not available. The rationale for cutting off damages at the point of resignation—encouraging an employee to stay on the job and resolve the discriminatory job action from within the workplace—does not apply where there can be no successful placement into the position wrongfully denied. Utilizing the date of resignation damages limitation in such a case is not compatible with the statutory objective of FEHA, which is to make the victim of discrimination whole. For this reason, the court erred in granting the motion *in limine* on damages. Ms. Cloud was entitled to prove the full extent of her damages necessary to make her "whole," including both back pay and front pay. This necessarily includes a determination of the period for which she should receive damages.

In an apparent attempt to avoid the need for a retrial on the damages question, the parties asked the trial court to make an advisory finding as to the damages Ms. Cloud would be entitled to receive if she were not limited by the court's *in limine* ruling. The scope of their purported "stipulation" is anything but clear on the record, and the court was understandably wary of issuing an advisory opinion. Nevertheless, the damages phase of the trial included evidence of Ms. Cloud's actual earnings and potential earnings after she left Western Atlas, as well as evidence as to the appropriate date to which damages should extend. Several dates were suggested: the date her employment terminated; the date the controller position would again become available; the date Western Atlas was scheduled to divide into two organizations, each with its own financial department; and the date of Ms. Cloud's mandatory retirement at age 65.

The advisory opinion calculated damages based on the corporations' exhibits, and ran the numbers out to Ms. Cloud's retirement age. We are uncertain what effect the court or the parties expected this advisory opinion to have, given the lack of certainty in their stipulation requesting it. When pressed at oral argument, the only element on which the parties agreed was that the court's arithmetic calculations are correct. Given the lack of clarity in their stipulation, as indicated by their statements at oral argument, we have no alternative but to remand on the damages issue.

On remand, the trier of fact must determine the amount and extent of back pay and front pay necessary to make Ms. Cloud whole for the harm she suffered because of the corporations' gender discrimination. (See Cal. Code Regs., tit. 2, § 7286.9 [Fair Employment and Housing Commission regulation describing factors to be utilized in fashioning remedies to make employee whole for unlawful employment practices].) It bears emphasis that in light of an employee's obligation to mitigate her losses (see *Ackerman* v. *Western Elec. Co., Inc., supra,* 643 F.Supp. 836, 855), we are discussing only the differential between the amount of compensation and benefits Ms. Cloud could reasonably have expected to receive as controller of Western Atlas, and the amount she earned or could reasonably have been expected to earn in mitigation. (See Cal. Code Regs., tit. 2, § 7286.9, subd. (a)(1)(A).)

V*

*Sufficiency of the Evidence*

. . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 895.

VI

*Punitive Damages*

■ Ms. Cloud claims the court erred in granting a partial judgment notwithstanding the verdict overturning the jury's finding that the corporations acted with malice and oppression. She argues that the evidence of discriminatory intent and pretext which supported the finding of liability also provided a sufficient basis for the jury to find malice or oppression. We agree.

Punitive damages are available under Civil Code section 3294 "where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, . . ." Malice is defined in section 3294 as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Subd. (c)(1).) Oppression is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (Subd. (c)(2).)

■ Because we are reviewing the propriety of a judgment notwithstanding the verdict, we "view the evidence in the light most favorable to the party who obtained the verdict and against the party to whom the judgment notwithstanding the verdict was awarded. [Citations.] In other words, we apply the substantial evidence test to the jury verdict, ignoring the judgment." (*Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530, 546 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158], overruled on other grounds in *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

■ Earlier, we explained that under the substantial evidence test, there is sufficient evidence to support the jury's determination that the corporations intentionally discriminated against Ms. Cloud because of her gender when she was not selected as the controller of Western Atlas. That evidence included direct statements by Mr. Casey and other executives that the company had never had a woman in that position, that it was not comfortable to have a woman in that position, that men do not like smart competent women working for them, and that perhaps gender was a factor in the decision.. Although the corporations presented evidence that the decision not to appoint Ms. Cloud as controller was based on her lack of operational

experience, the jury also heard evidence that the operational experience criterion was developed after Mr. Cusumano was selected for the position. From this the jury could conclude that operational experience was not a real requirement for the position, but a pretext utilized by the corporations to explain away its gender-based decision.

Malice under Civil Code section 3294 includes "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights . . . of others." (Subd. (c)(1).) The adjective "despicable" used in section 3294 refers to "circumstances that are 'base,' 'vile,' or 'contemptible.'" (*College Hospital Inc.* v. *Superior Court* (1994) 8 Cal.4th 704, 725 [34 Cal.Rptr.2d 898, 882 P.2d 894].) The jury could properly conclude that the corporations intentionally discriminated by denying Ms. Cloud a promotion based on gender, then attempted to hide the illegal reason for their decision with a false explanation, and that in this, they acted in a manner that was base, contemptible or vile. The discriminatory employment decision denied Ms. Cloud her protected right under FEHA "to seek, obtain, and hold employment without discrimination or abridgment on account of . . . sex . . . ." (Gov. Code, § 12920.) Evidence that the decisionmaker attempted to hide the improper basis with a false explanation also supports the jury's determination that the conduct was willful and in conscious disregard of Ms. Cloud's rights.

Viewing the evidence in the light most favorable to the jury's verdict, we find it sufficient to support a finding that the corporations acted with malice or oppression. The trial court erred in granting judgment notwithstanding the verdict as to the punitive damages finding. The cause must be remanded for trial on the question of the amount of punitive damages.

## VII*

### *Attorney's Fees*

. . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The damages portion of the judgment against Western Atlas and Litton is reversed and the cause remanded for determination of compensatory and

---

*See footnote, *ante*, page 895.

punitive damages in accordance with the views expressed in this opinion. In all other respects, the judgments are affirmed. The parties are to bear their own costs on appeal.

Vogel (C. S.), P. J., and Hastings, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied February 23, 2000. Chin, J., and Brown, J., were of the opinion that the petition should be granted.