Filed 4/11/16  Salinda v. DirecTV CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NOEL SALINDA, | B253360 |
| Plaintiff, Respondent, and Cross-Appellant, | (Los Angeles County Super. Ct. No. BC475999) |
| v. | |
| DIRECTV, LLC, | |
| Defendant, Appellant, and Cross-Respondent. | |

APPEAL from an order and judgment of the Superior Court of Los Angeles County, Ronald M. Sohigian, Judge.  Affirmed in part and reversed in part.

Alexander Krakow & Glick, J. Bernard Alexander, III and Tracy L. Fehr; The Sampath Law Firm and Supreeta Sampath for Plaintiff, Respondent, and Cross-Appellant.

Sheppard, Mullin, Richter & Hampton, Dianne Baquet Smith, Karin Dougan Vogel and Cassidy English; Paul Hastings and Paul W. Cane, Jr., for Defendant, Appellant, and Cross-Respondent.

Plaintiff Noel Salinda was terminated from her employment with defendant DirecTV, LLC. She sued under a variety of theories, including disability discrimination, failure to reasonably accommodate, failure to engage in the interactive process, retaliation, failure to prevent discrimination and retaliation, and wrongful termination in violation of public policy. Plaintiff sought compensatory and punitive damages. The trial court granted DirecTV's motion for summary adjudication of plaintiff's claims for age discrimination, wrongful termination in violation of public policy, and punitive damages, and the case went to trial on the remaining causes of action. The jury returned a special verdict for the plaintiff on the causes of action for disability discrimination, failure to prevent discrimination, and failure to engage in the interactive process, and for DirecTV on the causes of action for retaliation and reasonable accommodation. Plaintiff recovered damages of $1,178,341, and attorney fees of $857,628.

DirecTV appeals from the disability discrimination, failure to prevent discrimination, and interactive process verdicts, urging that it is entitled to judgment on these causes of action or, in the alternative, a new trial. Plaintiff cross-appeals from the reasonable accommodation verdict and from the grant of summary adjudication of her wrongful termination in violation of public policy and punitive damages claims.

We conclude that the special verdicts are not inconsistent, the jury was properly instructed, and the special verdicts are supported by substantial evidence. We thus affirm the jury's verdict in its entirety. However, we conclude that there are triable issues of material fact as to whether the individuals responsible for disciplining and terminating plaintiff were managing agents of DirecTV, and thus we reverse the grant of summary adjudication of plaintiff's punitive damages claim.

## FACTUAL BACKGROUND

### I.

### Plaintiff's Employment at DirecTV

Plaintiff began working for DirecTV as an administrative assistant in 1998. In 2006, she became a traffic specialist, a position she held until her termination on September 1, 2011. As a traffic specialist, plaintiff was responsible for inputting data

2

into DirecTV's on-screen channel guides and scheduling on-air programming. At various times, plaintiff was responsible for inputting scheduling data for standard definition (SD) and high definition (HD) movies.

From 2007 to 2011, plaintiff reported to Director of Traffic Operations Anthony Cope. Cope reported initially to Senior Director of Traffic Operations Mike McDaniel, and later to Vice President of Traffic Operations Jim Yokers. Yokers reported to Vice President (later, Senior Vice President) John Ward.

## II.

### Plaintiff's Eye Condition

Plaintiff developed problems with her vision in 2008. She had difficulty with reading, contrast, and depth perception, and she could not distinguish between some colors. She consulted Dr. Ron Gallemore, a retina specialist, in December 2008, and was diagnosed with central serous retinopathy (CSR) in her left eye. CSR is caused by fluid leaking under the retina, resulting in a blister on the retina and blurred vision.

By February 2011, plaintiff was continuing to experience CSR and had developed macular edema (swelling of the central portion of the retina (the macula)) and macular degeneration (damage to the macula) in her left eye. Both conditions compromise vision in the macula, causing a portion of the visual field to appear smudged or wavy and making it difficult to distinguish small letters and numbers.

Plaintiff saw Dr. Gallemore throughout 2011. In March, June and July, she reported to Dr. Gallemore that there were no changes to her vision. In September, following her termination from DirecTV, plaintiff reported that the vision in her left eye was getting worse and "[complained of a] grey smudge getting worse and distortion . . . getting worse."

## III.

### Plaintiff's Disclosure of Her Eye Disease and
### Requests for Accommodation in 2009 and 2010

Plaintiff testified that in about 2009, she told Cope and McDaniel she had a serious eye condition that could lead to blindness, and she was seeing an eye doctor for

eye injections. Plaintiff said she specifically told McDaniel "how my vision was affected with confusing letters and numbers." She said she unsuccessfully sought accommodations for her vision problems, including requesting better lighting, in 2009 and 2010. When she received no response, she purchased a natural spectrum lamp for her desk in December 2010 or January 2011. Plaintiff also said that beginning in about 2009 and "continually" thereafter, she requested a quieter working environment to help her concentrate. She said Cope responded by telling her to buy headphones.

Cope, McDaniel, and Yokers each testified that plaintiff did not disclose at any point in 2009 or 2010 that she had an eye disease or required accommodations. Cope testified that he did not recall plaintiff ever asking for a quieter working environment, and said he never suggested plaintiff buy headphones.

## IV.

### Plaintiff's Increased Error Rate in December 2010

It is undisputed that plaintiff had a low data entry error rate between 2007 and December 2010. In December 2010, however, plaintiff began to make significantly more data entry errors.

Plaintiff testified that prior to December 2010, she was responsible for scheduling SD movies. She received the SD movie data electronically, in a format she found relatively easy to read. In December 2010, however, she was asked to schedule HD movies, which was a more difficult assignment because there were more channels and more associated tasks. The HD movie data was provided to plaintiff electronically in a grid format that contained data in very small font. Plaintiff was responsible for transferring the data into a scheduling program that had a small (eight inch by eight inch) application screen that plaintiff said could not be enlarged.

Plaintiff said that in about December 2010, she asked that the HD scheduling grid be provided to her in a larger font. She said Cope told her to enlarge the grid on a copy machine, a statement he denied. Plaintiff printed hard copies of the grid, but said the grid could not be enlarged because "in order to enlarge it and get it all on the same sheet, it would be a humongous piece of paper to work from."

4

Cope testified that he discussed plaintiff's increased error rate with her when he first noticed it in December 2010. He said plaintiff did not disclose anything about her eye, but instead insisted that her errors should be caught by the traffic department's second shift. Cope said it was her responsibility to check her own work and that he believed plaintiff was making repeated errors because she was unwilling to do so.

Cope also testified that plaintiff told him at some point that she found the scheduling documents hard to read because the font was small. He suggested that she enlarge the documents on her computer monitor, as he typically did, to make them easier to read.

Cope testified that at Yokers' request, he met with plaintiff some time between November 2010 and April 2011, to discuss her workload. Cope said he offered to reassign most of the HD scheduling, but plaintiff did not want to let it go. Cope said they agreed plaintiff would retain half the HD scheduling, and Cope would assign the rest to another traffic specialist, Katherine Harada.

## V.

## April and May 2011

### A. *Plaintiff's April 2011 Disclosure of Her Eye Condition to Yokers and Request for a Reduced Workload*

In early April 2011, plaintiff spoke to Yokers about her eye condition. Yokers said plaintiff told him she was going to need time off work to see an eye doctor, and that she would be receiving treatments by way of injections in her eye. He said plaintiff did not tell him she had an eye condition that could lead to blindness, did not say her eye condition was having an impact on her work, and did not ask for any assistance or accommodation. She asked Yokers to keep the information confidential. Yokers notified plaintiff's immediate supervisor, Cope, that plaintiff was going to receive treatment from an eye doctor that included injections.

Plaintiff recalled the April conversation with Yokers somewhat differently. She said she told Yokers she was aware she was making errors, and that she was having difficulty with her work because she had been diagnosed with an eye disease and her

5

vision was affecting her performance. She said that at the time of this conversation, Yokers knew she had a lack of vision in her left eye due to a disease that could lead to blindness. She subsequently told him she was getting injections in her eye.

Subsequent to plaintiff's meeting with Yokers, Cope met with plaintiff to discuss her increasing error rate. According to Cope's notes, "This meeting did not go over well with Noel as she took this as a personal attack and attempted to shift the focus over to a lack of appreciation for her work and placed some of the blame with the Planning group. Based on the fact that we were having a lack of issues with the other half of the redistributed schedules [being handled by Katherine Harada] I came to the conclusion that her eyesight may be the underlying issue. She has made comments with regards to having previous Dr. appointments requiring insertion of needles into her eye to address sight issues."

Also in April, plaintiff came to Yokers and said she was having difficulty managing her workload, which she said was extremely heavy and required her to input a large number of revisions. Yokers said plaintiff did not tell him at that time that the font of the scheduling documents was too small for her to read or that she suffered from an eye disease. Subsequent to this conversation, Yokers reduced the number of revisions for which the traffic department was responsible. Yokers also directed a change to the format in which scheduling information was provided to the traffic department (a "spreadsheet" rather than a "grid") so that it was "more data-entry-friendly." Finally, Yokers directed Cope to look into plaintiff's workload.

Cope contacted Katherine Harada to confirm that she was still doing half the HD scheduling. Harada said that plaintiff had taken back the HD schedules a few weeks earlier, saying she had some extra time. Cope directed plaintiff to return the work to Harada.

*B.      Cope and Yokers' April 22, 2011 Meeting with Plaintiff*

On April 22, 2011, Cope and Yokers met with plaintiff about the increasing number of errors she was making. Cope's notes of the meeting state that, "Towards the conclusion of this discussion I simply asked what else we can do to accommodate. I also

6

made her aware that we've been accommodating her concerns and complaints by making the changes over the past several months. She continued to state she just wants to be appreciated. I then asked was the workload ever an issue because it sounded to me based on this new revelation that the workload was never an issue. Noel stated that the workload was never an issue, but the lack of appreciation was the issue." Cope's notes state that although plaintiff identified lack of appreciation as the issue, it "did not explain the amount of errors that [were] surfacing unless these mistakes were intentional. I do not believe the mistakes are intentional or a ploy to get attention, but rather related to a medical condition that she has not readily admitted."

At trial, Cope said that at the time of the April 22 meeting, he was not certain why plaintiff was making so many errors. "By that time . . . I was aware she had an appointment with the eye injection. [*Sic*.] And we had meetings where she mentioned the reason for her performance issues was she wasn't feeling appreciated. So . . . I didn't really know what the problem was. It could have been eye related, it could possibly [have] been, you know, something having to do with how she felt about her job. I didn't know at that point what it was . . . ."

C.    *Cope's May Email to Ward About Plaintiff's Performance*

On May 18, 2011, Cope emailed Ward that there had been a "significant rise in the amount of data entry" errors made by plaintiff, which Cope "attribute[d] to the deterioration of sight in one of her eyes." Cope testified that he assumed plaintiff's errors were due in part to deteriorating eyesight because plaintiff had told him in March or April that she was getting needle injections in her eye. Cope added: "There has also been drama surrounding all this for the past several months and we have tried to accommodate on Noel's behalf."

On May 19, Ward forwarded Cope's email to human resources representative Mona Dhillon, stating that "I guess her eyesight is now an issue. . . . I realize that I am in a bit of a pickle here." Ward testified at trial that he did not recall what he meant by the last statement and that he did not discuss plaintiff's eyesight with Dhillon.

7

# VI.

## June 2011

### A.     *Plaintiff's Return from Vacation and Banner Ad Training*

Plaintiff took a 10-day vacation in late May 2011, returning to work on June 1. She testified that upon her return, she was surprised to discover that no one had covered her scheduling work. As a result, she had to "rush through doing the data entry" and was not able to check her work.

Plaintiff said that when she approached Cope to discuss the backlog, Cope told her that she would be relocating to the corporate building to do banner ad training.[1] Plaintiff said she told Cope she was not comfortable doing the banner ads because she was not used to the programs and, due to her vision, she had a hard time integrating documents from different sources. Nonetheless, she was assigned to begin training on the banner ads sometime prior to June 15.

Cope had a very different account of the events surrounding plaintiff's May 2011 vacation and banner ad training. He testified that prior to plaintiff's vacation, he asked plaintiff where she was with her scheduling and whether anyone should work on it during her absence. "She said, no, she didn't want anyone touching her work. She'd take care of it when she [got] back. And I told her that's kind of pushing it and the timeline's going to be pretty close. She said she'll take care of it. And I said when she [got] back to let me know if she needs any assistance." Cope said he had no further discussion with plaintiff about the issue until early August, when plaintiff brought it up during a disciplinary meeting. Cope "reminded her that that's what she asked for and so no one touched it and that's the reason nothing was done. . . . [¶] . . . [¶] [Plaintiff] seemed like she kind of recalled it at that point."

With regard to the banner ads, Cope testified that in June 2011, he assigned plaintiff to learn to input banner ads because "[s]he had expressed previously she was interested in doing some different things. When that opportunity came up, I figured I

---

**1**     Cope testified that guide banners or banner ads are advertising spots inserted in online program guides.

would let her have the first opportunity to train on it, see if it is something that she wanted to do." Cope emailed Yokers in early June that he had proposed to plaintiff that the HD scheduling be assigned to others so she could focus on the banner ad training; according to Cope, plaintiff "declined to let [the HD scheduling] go," stating that "handling both would not be an issue." Cope said plaintiff never told him she thought banner ads would be too difficult because of her eyes.

In early June 2011, at Yokers' direction, the format of scheduling documents was changed from a grid to a spreadsheet, which plaintiff found easier to read. Plaintiff said that both the reduction in workload and the change to the scheduling format "greatly" assisted her in doing her work accurately.

### B. The June 15, 2011 Verbal Warning Meeting

On June 13, 2011, Dhillon informed Ward that she had asked Yokers and Cope to meet with plaintiff to let her know her performance had deteriorated, the company was considering disciplinary action, and "if there is anything they should be aware of please let us know." The email to Ward concluded: "We will move forward with the PIP [performance improvement plan] but we would prefer to have that information and decide whether to accommodate or do a fitness for duty. [¶] We know it will get sticky if this arises in the middle of our disciplinary process."

Cope and Yokers met with plaintiff on June 15, 2011. Yokers' summary of the June 15 meeting said as follows: "Held our meeting with Noel yesterday – points discussed: [¶] Noel has historically been very accurate with her data entry. [¶] However, in the past few months we have seen a dramatic increase in data entry errors. [¶] Some of these errors have led to on air outages. [¶] There is a near-zero tolerance for on air outages. [¶] We do realize given the amount of data entry taking place in this department that errors may occur, but in Noel's case the amount of errors is becoming alarming. [¶] Noel had confided to me that she's being treated for an eye ailment. [¶] I asked if this ailment is impeding her ability to correctly enter data. Because of the number of errors, we're heading towards disciplinary action, and if there is a medical reason behind the drop off in accuracy, we need to know about it in order to handle the

9

situation fairly. [¶] Noel's response was her eyes get tired by the end of the day resulting in blurred vision. Some days the effect occurs earlier in the day. [¶] I asked her to get a doctor's note outlining her condition. She agreed.

"Noel is currently pegged as the person to back up Melanie Doyle for guide banner operations and scheduling. We believe the amount of data entry associated with this is not as demanding as pay per view movies and should be a bit easier on the eyes . . . . Noel is agreeable to this effort and is looking forward to working with Melanie. The training is supposed to start on July 9th after Melanie takes receipt of new software to handle guide banner operations."

Yokers testified at trial that at the time of the June 15 meeting, he was still trying to figure out why plaintiff was experiencing a drop-off in accuracy. "Is this because she's tired of doing the job? Is it because she doesn't like working for Anthony [Cope]? Is it because – just trying to go through and figure out what is going on. [¶] She had confided in me about the eye injection so I asked about it, but at no time prior to that was she saying she was having blurred vision that was causing these errors."

Plaintiff had a somewhat different recollection of the June 15 meeting. She said she could not recall anyone asking her about her eye condition but she volunteered that she was experiencing blurred vision. She said: "[D]ue to my vision issue my eyes would get very blurry by the end of the day. It was a strain on my one good eye and . . . sometimes my eyes would be strained before even lunchtime." She did not recall telling Yokers and Cope "anything else about the issues with [her] eyes that were caused by looking at the source documents."

C.     *Plaintiff's Provision of a Doctor's Note*

On June 20, 2011, Cope emailed plaintiff to ask whether she had obtained a doctor's note. Plaintiff said after she received Cope's email, she contacted Dhillon to ask what the note should contain. According to plaintiff, "I was informed that I either produce a doctor's note or I would be put on written notice and I could be terminated. I was not told what needed to be put in the doctor's note."

10

On June 22, 2011, Dr. Gallemore provided plaintiff with a note that stated as follows: "The patient has an eye condition that affects her work environment/habits. A larger monitor with bigger lettering as well as ergonomic evaluation of her workspace may help her function better at work. In addition, 10 minute breaks for every hour of computer work should be taken." Dr. Gallemore said he recommended these accommodations because plaintiff felt they would assist her performance.

Plaintiff said she provided copies of Dr. Gallemore's note to Yokers, Cope, and Dhillon on June 23. On June 28, 2011, Dhillon emailed Dr. Gallemore's office asking for clarification of the note. His office responded on June 30 that plaintiff had no work restrictions, and that she should be provided with the following: "A large monitor with bigger [lettering], as well as an ergonomic evaluation of her workplace, in order to help her function better at work. In addition, 10 minute breaks for every hour of computer work should be taken."

## VII.

## July 2011

### A.     *Plaintiff's Ergonomic Evaluation and Larger Monitor*

Plaintiff testified that she never received an acknowledgement that her doctor's note had been received, and therefore she called Dhillon to follow up. On July 18, 2011, Dhillon emailed plaintiff and told her to request an ergonomic evaluation. Plaintiff received an ergonomic evaluation on July 18 or 19, 2011.

Plaintiff received a 23-inch monitor on July 22, 2011. She requested a second monitor the same day; Ward stated in an email that he would "pick one up over the weekend." Plaintiff testified that she received a second monitor, but she never received the video card necessary to make the two monitors function independently. As a result, she said she never was able to use the dual monitors in a way that assisted her in minimizing errors.[2]

---

[2]     A coworker, Katherine Harada, testified that she saw plaintiff's two monitors working independently.

Dhillon said employee breaks were not monitored, and plaintiff took breaks as she needed them.

B.     *Plaintiff's Application for an Administrative Assistant Position*

In June or July 2011, plaintiff learned that an administrative assistant position would be opening, and she applied for it.  She said Dhillon had suggested the position might be a better fit because of her vision disability.  Plaintiff had three interviews for the position, but ultimately it was offered to someone else.  At trial, Dhillon testified that she never told Yokers or McDaniel that plaintiff should get preferential treatment for the administrative assistant position because of her eye.

C.     *Plaintiff's Mid-Year Performance Review*

Plaintiff received her 2011 mid-year performance review in late July 2011.  In relevant part, it said:  "Noel's performance accuracy has been below average first half of the year.  The amount and consistency of discrepancies surrounding her work has increased dramatically since the last review.  We have accommodated some of her own suggestion[s] with regards to reducing and swapping workload[.]  [T]hat did not appear to have much impact on the amount of discrepancies that were being escalated.  We are continuing to address the issue by ordering an ergonomic review of her work space and adding a larger monitor.  We will continue to work through the issues that may have contributed [to] this turn of events and monitor the situation.  [¶]  She will need to continue to work on addressing her issues with others in a less confrontational approach.  An incident with IT [the information technology department] earlier this year escalated into an uncomfortable event in the traffic room.  The altercation could have been diffused in a conducive and civil manner or taken to management before becoming a major disruption."

## VIII.

### August and September 2011

A.     *Performance Improvement Plan (PIP)*

Plaintiff was provided with a written "Performance Improvement Plan" (PIP) on August 3, 2011.  With regard to "achieving results," the PIP stated:  "There have been

12

multiple instances where you have made data entry mistakes that have been caught during our checking process or . . . by other departments. On 5/16/11 an inciden[t] with an incorrect 2D title scheduled on a 3D channel led to on-air outage. On several occasions (3/24, 4/29, 5/8, 5/12, 5/13, 5/15, 5/16, 7/25) incorrect movie formats were scheduled some of which resulted in impairment to the broadcast of the movie. Over the past several months there have been recurring incidents of incorrectly mapped [pay-per-view] channels that were rectified by the 2d shift team before they became on-air issues. [¶] We have accommodated your request to allocate the amount of scheduling and updates you do by splitting your workload with other members of the traffic team. Since that time you have continued to make a large number of mistakes at a rate that's not tolerable by our department standards. You have been advised that it is your primary responsibility to initially check your own work or work with a member of your team to have your work verified for accuracy."

The PIP also discussed plaintiff's repeated "altercations with members of the traffic team and IT [information technology] desktop support that [have] resulted in complaints from several team members and IT" and "occasions where your personal discontent with changes regarding work responsibilities or Company policy have been negatively voiced by you in an insubordinate manner in front of staff."

The PIP concluded: "You will be monitored for a period of 30 days beginning 08/03/2011 and ending 09/02/2011. Your ability to met the objectives outlined below will be reviewed and discussed as needed during this period. It is your responsibilit[y] to bring any issues to management that prevent you from accomplishing your assigned tasks. At the end of this period a final evaluation will be made as to your success in remaining consistent as it relates to your performance. If you fail to meet all of the duties and responsibilities required of you in your job as a Specialist, . . . you will subject yourself to further disciplinary action up to and including termination."

Cope testified that when he issued the PIP, he did not know whether Dhillon "had engaged in an interactive process with [plaintiff]." He "assumed" she had.

13

B. *Plaintiff's Performance Following the PIP*

On August 29, 2011, Cope advised Dhillon that plaintiff had made an error that was caught by the second shift on August 24. He said: "This is the same type of issue that occurred a few weeks ago on 7/30." Also, on August 25, Cope "received notice that drama is brewing in the Traffic room. I sat down and talked individually with the parties involved: Tiffani Smith, Brian Umana and Noel Salinda. My summary of the events is Noel overheard a discussion between [co-workers] Brian and Tiffani. As a result of what she heard Noel decided to engage Brian with regards to the discussion he just concluded with Tiffani. The manner in which Noel pursued Brian with the discussion she overheard was labeled as [drama-filled] by both Brian and Tiffani. . . . [¶] This reflects directly on the performance improvements I have [cited in] her PIP."

On August 30, 2011, Dhillon forwarded Cope's August 29 email and added: "We can't ding her for the conversation but for the error I am going to try – will let you know."

C. *The August 30 On-Air Outage*

On August 31, 2011, Cope learned that there had been a on-air outage the day before, and he asked Depali Khanna to look into it. Khanna responded that on August 30, at about 11:45 a.m., plaintiff had taken a call from the broadcast operations center advising that a pay-per-view movie had been incorrectly scheduled to end at 2:00 p.m., instead of at 3:19 p.m. Plaintiff said she would correct the problem, but at 2:00 p.m., the channel went black. A coworker restored the movie transmission 14 minutes later. Khanna reported that she spoke to plaintiff about the incident, and plaintiff admitted that she had forgotten to take a necessary step to extend the movie transmission. Plaintiff did not give Khanna any other explanation for the outage and did not mention her vision. Khanna told Cope that plaintiff seemed unconcerned about the outage: "[Khanna] mentioned that . . . [plaintiff's] attitude was kind of like, you know, what's the big deal. . . . [¶] . . . [¶] It's just a 14-minute outage. It was like a C or D title movie. It's not like anybody was watching it. If somebody was watching it, they could easily pick up the movie on another channel."

14

Cope thought "it was a pretty crappy attitude to have towards an outage." He characterized the error as "black and white a careless mistake" and said that he believed many of plaintiff's prior mistakes were "part of that same carelessness." He said: "It looked to me like it was just straight carelessness, somebody rushed through what they were doing. They could take three to five minutes to wait and verify what they did. [This] [d]irectly ties back to all the problems that we've been dealing with trying to get [plaintiff] to double-check what she's been doing, been brought up on multiple occasions back in December, again in April, I believe again in June, again on a PIP, and for whatever reason she just did not feel she was responsible for double-checking her work."

Plaintiff testified at trial that she had taken the steps necessary to extend the movie broadcast. She then had to leave the office to attend an interview for the administrative assistant position, and so she asked a co-worker to verify that the change had gone through. When she returned from the interview, she learned the movie had shut down early.

### D.     *Plaintiff's Termination*

Cope said he did not immediately make the decision to terminate plaintiff, but instead "went home, kind of slept on it and went kind of back and forth to figure out is there any other possibility other than carelessness for why this happened, and I went through that several times and I couldn't think of anything other than carelessness. . . . So when I came into work, I believe that was September 1st, I decided, you know, that was it and I called Mona [Dhillon] and said, you know, I want to move to termination."

Cope told plaintiff on September 1 that she was being terminated. During the termination meeting, plaintiff never mentioned her eye or any needed accommodations.

Cope said the decision to terminate was his alone. He decided to terminate plaintiff because of scheduling errors, carelessness, and ongoing conflict with coworkers. He said he did not decide to terminate plaintiff because of her eye or for her request for accommodations. Further, he said the August 30 on-air outage was unrelated to plaintiff's eye condition: "[T]hat outage was clearly an example of someone that rushed through what they were doing, didn't double-check their work . . . . It was just careless."

15

Plaintiff testified that her final salary at DirecTV was approximately $60,000 per year, plus medical, dental, vision, and life insurance. She said she had planned to continue working for DirecTV for at least seven more years. As of the date of her termination, plaintiff believed she could have performed her job with accommodations.

## IX.

## Post-Termination Issues

Following her termination, in February 2012, plaintiff was examined by optometrist Dr. Brett Nagatani. He suggested some low-vision aids he believed would help her. They included an illuminated hand magnifier, a screen magnification software program called "zoom text," and a "zoom text" keyboard.

As of the time of trial, plaintiff said she had applied for more than 600 positions, but had not been able to find new work. She had no income other than unemployment benefits, which were soon to run out, and no health insurance. Plaintiff said she had been very lonely and depressed since her termination.

## PROCEDURAL BACKGROUND

## I.

## Operative Complaint

Plaintiff filed the present action on December 30, 2011, and filed the operative first amended complaint on April 9, 2012. The first amended complaint asserted nine causes of action: (1) disability discrimination; (2) failure to provide reasonable accommodation; (3) failure to engage in the interactive process; (4) retaliation; (5) failure to prevent discrimination; (6) employment discrimination based on age; (7) wrongful termination in violation of public policy; (8) Labor Code violations; and (9) violations of Business and Professions Code section 17200.

16

## II.

## DirecTV's Summary Adjudication Motion

On September 28, 2012, DirecTV filed a motion for summary adjudication of the first, fourth, fifth, sixth, and seventh causes of action, and of plaintiff's prayer for punitive damages.

On December 14, 2012, the trial court granted summary adjudication of the sixth and seventh causes of action (age discrimination and wrongful termination in violation of public policy), and denied summary adjudication of the first, fourth, and fifth causes of action (disability discrimination, failure to provide reasonable accommodations, and failure to prevent discrimination). The trial court also granted summary adjudication of plaintiff's request for punitive damages.

## III.

## Trial, Judgment, and Appeal

The remaining causes of action were tried to a jury August 12 to 23, 2013. The jury returned a special verdict for the plaintiff on the causes of action for disability discrimination, failure to prevent discrimination, and failure to engage in the interactive process, and for DirecTV on the causes of action for retaliation and reasonable accommodation. The jury awarded plaintiff damages as follows:

| | |
|---|---|
| Disability discrimination: | $214,170.50 |
| Retaliation: | $0 |
| Failure to prevent discrimination: | $750,000 |
| Failure to provide reasonable accommodation: | $0 |
| Failure to engage in the interactive process: | $214,170.50 |
| TOTAL: | $1,178,341 |

Judgment on special verdict was entered on October 1, 2013. DirecTV moved for a new trial and judgment notwithstanding the verdict; the court denied both motions on November 19, 2013. On January 13, 2014, the trial court awarded plaintiff attorney fees of $857,628.75, and costs of $14,490.50.

17

DirecTV timely appealed from the judgment and post-judgment orders. Plaintiff timely cross-appealed.

**DIRECTV'S APPEAL**

**I.**

**Overview**

The Fair Employment and Housing Act (FEHA) "prohibits several employment practices relating to physical disabilities. First, it prohibits employers from refusing to hire, discharging, or otherwise discriminating against employees because of their physical disabilities. (Gov. Code, § 12940, subd. (a).) Second, it prohibits employers from failing to make reasonable accommodation for the known physical disabilities of employees. (*Id*., subd. (m).) Third, it prohibits them from failing to engage in a timely and good faith interactive process with employees to determine effective reasonable accommodations. (*Id*., subd. (n).) Fourth, it prohibits them from retaliating against employees for opposing practices forbidden by FEHA. (Gov. Code, § 12940, subd. (h).) Separate causes of action exist for each of these unlawful practices. (*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 987; *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 54.)" (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 371 (*Nealy*).)[3] A separate cause of action also exists for an employer's failure to take all reasonable steps to prevent discrimination. (§ 12940, subd. (k); *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1313.)

DirecTV contends that the reasonable accommodation and interactive process claims are irreconcilably inconsistent, and thus a new trial is required. It also attacks the special verdicts against it, contending that it is entitled to judgment on the causes of action for disability discrimination, failure to prevent discrimination, and failure to engage in the interactive process. Finally, DirecTV contends that the jury was misinstructed on the elements of disability discrimination.

---

[3]  All subsequent undesignated statutory references are to the Government Code.

18

## II.

## The Jury's Reasonable Accommodation and Interactive Process
## Verdicts Are Not Irreconcilably Inconsistent

DirecTV urges that it is entitled to a new trial because the reasonable accommodation and interactive process verdicts are irreconcilably inconsistent. For the reasons that follow, the contention is without merit.

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other. [Citation.] If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency. [Citations.] [Fn. omitted.] If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency. [Citations.]

"On appeal, we review a special verdict de novo to determine whether its findings are inconsistent. [Citation.] With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict. [Citations.] ' " 'Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.' " [Citations.]' [Citation.] 'The appellate court is not permitted to choose between inconsistent answers. [Citations.]' [Citation.] The proper remedy for an inconsistent special verdict is a new trial. [Citation.]" (*Singh v. Southland Stone, U.S.A., Inc*. (2010) 186 Cal.App.4th 338, 357-358.)

DirecTV asserts that the reasonable accommodation and interactive process special verdicts are inconsistent because the interactive process " 'is not an end in itself—it is a means to the end of forging reasonable accommodations.' " Thus, DirecTV suggests, "[w]here as here, an employee is reasonably accommodated, the interactive process claim necessarily fails."

The Court of Appeal rejected a similar contention in *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413. There, the plaintiff suffered from a

19

variety of physical ailments. After he filed an age discrimination complaint with the Equal Employment Opportunity Commission, plaintiff's work environment changed: He was treated coldly and ignored at management meetings, and his requests for accommodation were ignored. (*Id*. at p. 418.) Subsequently, plaintiff's employer denied his request to transfer to an office closer to his home, and plaintiff became depressed and was unable to work. (*Id*. at p. 419.) Plaintiff sued his employer for various violations of the FEHA, and the jury returned a split verdict, finding, among other things, that the employer did not fail to provide a required accommodation to plaintiff for his physical disability, but did fail to engage in an interactive process. (*Ibid*.)

The employer appealed, contending that the reasonable accommodation and interactive process verdicts were inconsistent. The Court of Appeal disagreed. It noted that where special verdicts appear inconsistent, "if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them." (*Wysinger v. Automobile Club of Southern California*, *supra*, 157 Cal.App.4th 413 at p. 424.) It then concluded that the special verdicts could be reconciled, explaining as follows:

"Under FEHA, an employer must engage in a good faith interactive process with the disabled employee to explore the alternatives to accommodate the disability. [Citation.] 'An employee may file a civil action based on the employer's failure to engage in the interactive process.' [Citation.] Failure to engage in this process is a separate FEHA violation independent from an employer's failure to provide a reasonable disability accommodation, which is also a FEHA violation. [Citations.] An employer may claim there was no available reasonable accommodation. But if it did not engage in a good faith interactive process, 'it cannot be known whether an alternative job would have been found.' [Citation.] The interactive process determines which accommodation is required. [Citations.] Indeed, the interactive process could reveal solutions that neither party envisioned.

"Here the jury could find there was no failure to provide a required accommodation because the parties never reached the stage of deciding which

20

accommodation was required. [Defendant] prevented this from happening by its refusal to engage in the interactive process." (*Wysinger v. Automobile Club of Southern California*, *supra*, 157 Cal.App.4th 413 at pp. 424-425.)

The *Wysinger* analysis applies equally in the present case. Based on the evidence before it, the jury could have concluded that DirecTV provided plaintiff some accommodations (i.e., an ergonomic evaluation and larger computer monitor), but then failed to continue to engage in the interactive process to determine whether these accommodations were effective. It thus could have concluded that DirecTV acted *reasonably* in providing the accommodations suggested by plaintiff's doctor, but *unreasonably* in not continuing the interactive process with plaintiff thereafter.

Alternatively, the jury could have concluded that if DirecTV had continued to engage with plaintiff after providing the initial accommodations, it would have learned about additional accommodations that might have assisted plaintiff in performing her job, such as a second functional computer monitor, screen magnification software, and a "zoom text" keyboard. As in *Wysinger*, the jury therefore could have concluded that DirecTV failed to engage in a good faith interactive process with plaintiff after July 2011, but that there was no failure to provide additional accommodations because the parties never reached the stage of determining that those accommodations were reasonable and necessary.

*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185 (*Wilson*), on which DirecTV relies, does not compel a different conclusion. In *Wilson*, the plaintiff was accommodated for a period of time, and then went on unpaid leave while her employer sought alternative positions for her. Ultimately, plaintiff returned to work in her original position with the accommodations she requested. Two weeks later, she sued her employer for failure to accommodate and failure to engage in the interactive process. (*Id*. at pp. 1189-1192.)

A jury returned a verdict for the defendant, and plaintiff appealed, contending that substantial evidence did not support the verdict for the defendant on the failure to accommodate claim. The Court of Appeal disagreed and affirmed. It explained: "[T]he

21

record demonstrates the County engaged in a process aimed at trying to accommodate Wilson. *Indeed, the success of its process is borne out by the fact that in the end, Wilson got exactly what she wanted—albeit after a series of temporary accommodations.* (See *Hanson* [*v. Lucky Stores, Inc.* (1999)] 74 Cal.App.4th [215], 229 [employer cannot be held liable for failing to engage in interactive process when the employee was in fact offered a reasonable accommodation]; see also *Watkins v. Ameripride Services* (9th Cir. 2004) 375 F.3d 821, 829, fn. 5 [fact that employer reasonably accommodated plaintiff's disability precluded claim it failed to engage in interactive process].)" (*Wilson*, *supra*, 169 Cal.App.4th at p. 1195, italics added.)

DirecTV contends that the italicized language and the court's citation to *Hanson* stand for the proposition that a reasonable accommodation finding "forecloses interactive-process liability" as a matter of law. According to DirecTV, "If the end—reasonable accommodation—is achieved, alleged process-based shortcomings fall by the wayside." We do not agree that *Wilson* should be read so broadly. The *Wilson* court made the italicized statement with respect to an interactive process that culminated in the plaintiff receiving all the accommodations she requested and, thereafter, successfully performing her job. Indeed, the *Wilson* court noted that when the case came to trial nearly two years later, plaintiff was still working for the defendant under the agreed accommodations. (*Wilson*, *supra*, 169 Cal.App.4th at p. 1192.) In the present case, in contrast, the accommodations DirecTV provided were not successful, and a further interactive process to determine additional accommodations was foreclosed by plaintiff's termination. On these facts, we cannot conclude that the jury's reasonable accommodation finding precluded liability for failure to engage in the interactive process as a matter of law.

### III.

### The Jury's Special Verdicts Were Supported by

### Substantial Evidence

DirecTV contends that even if the special verdicts were not inconsistent, the judgment should be reversed because the interactive process, disability discrimination,

22

and failure to prevent discrimination verdicts are not supported by substantial evidence. For the reasons that follow, we disagree.

"Under the substantial evidence standard of review, 'the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact.' [Citation.] We are required to accept all evidence that supports the successful party, disregard the contrary evidence, and draw all reasonable inferences to uphold the judgment. [Citation.] 'While substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations].' [Citation.] Thus, it is not our role to reweigh the evidence, redetermine the credibility of the witnesses, or resolve conflicts in the testimony, and we will not disturb the judgment if there is evidence to support it. [Citations.] 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' [Citation.]" (*Harley-Davidson, Inc v. Franchise Tax Board* (2015) 237 Cal.App.4th 193, 213-214.)

### A. Failure to Engage in the Interactive Process

"The FEHA makes it 'an unlawful employment practice . . . [¶] . . . [¶] . . . [f]or an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.' (§ 12940, subd. (n).) Although the interactive process is an informal process designed to identify a reasonable accommodation that will enable the employee to perform his or her job effectively (*Scotch* [*v. Art Institute of California* (2009)] 173 Cal.App.4th [986,] 1013), an employer's failure to properly engage in the process is separate from the failure to reasonably accommodate an employee's disability and gives rise to an independent cause of action (*Gelfo* [*v. Lockheed Martin Corp.* (2006)]

23

140 Cal.App.4th [34,] 61).” (*Swanson v. Morongo Unified School Dist.* (2014) 232 Cal.App.4th 954, 971.)

“ ‘ “[T]he interactive process is at the heart of the [FEHA's] process and essential to accomplishing its goals.  It is the primary vehicle for identifying and achieving effective adjustments which allow disabled employees to continue working without placing an 'undue burden' on employers.” ’ (*Jensen* [*v. Wells Fargo Bank* (2000)] 85 Cal.App.4th [245,] 261-262.)  ‘In a practical sense,’ as another court observed in the ADA context, ‘the interactive process is more of a labor tool than a legal tool, and is a prophylactic means to guard against capable employees losing their jobs even if they are not actually disabled.  It is clearly a mechanism to allow for early intervention by an employer, outside of the legal forum, for exploring reasonable accommodations for employees who are perceived to be disabled. . . .’ (*Jacques* [*v. DiMarzio, Inc.* (2002)] 200 F.Supp.2d [151,] 170.)” (*Gelfo v. Lockheed Martin*, *supra*, 140 Cal.App.4th at pp. 61-62.)

“The employee must initiate the process unless his or her disability and the resulting limitations are obvious.  Once initiated, the employer has a continuous obligation to engage in the interactive process in good faith.  (*Scotch*, *supra*, 173 Cal.App.4th at p. 1013.)  ‘Both employer and employee have the obligation “to keep communications open” and neither has “a right to obstruct the process.” [Citation.] “Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party.  Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.” [Citation.]’ [Citation.]

“ ‘[T]he fact that an employer took some steps to work with an employee to identify reasonable accommodations does not absolve the employer of liability. . . .  If the employer is responsible for a later breakdown in the process, it may be held liable.’ (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 985.)” (*Swanson v. Morongo Unified School Dist.*, *supra*, 232 Cal.App.4th at pp. 971-972.)

24

Viewing the evidence in the light most favorable to plaintiff, we cannot agree that the jury's finding that DirecTV "fail[ed] to participate in a timely good-faith interactive process with Noel Salinda to determine whether reasonable accommodation could be made" was unsupported by substantial evidence. Plaintiff testified that in about 2009, she told her supervisors, Cope and McDaniel, that she had a serious eye disease that was affecting her vision and causing her to confuse letters and numbers. She also testified that in 2009 or 2010, she requested better lighting and a quieter workspace as accommodations for her vision problems. Plaintiff said she was not provided either accommodation, and that no one at DirecTV asked how the company could accommodate her until at least April 2011, more than a year after she disclosed her disability. Given this evidence, the jury could reasonably have found that DirecTV became aware of plaintiff's need for accommodation in 2009 or 2010, but did not timely engage in an interactive process with her to identify and implement an appropriate accommodation until at least 2011.

The jury could also have reasonably concluded that DirecTV did not engage in a good faith interactive process with plaintiff after receiving her doctor's note in June 2011. It was undisputed that plaintiff continued to make errors even after she was provided with the accommodations requested by Dr. Gallemore. Although the company's internal emails demonstrated that Cope, Yokers, and Dhillon all knew about these errors, there is no evidence that anyone at DirecTV approached plaintiff to ask how the company could further accommodate her. From this evidence, too, the jury reasonably could have concluded that DirecTV failed to engage in a good faith interactive process.

DirecTV notes that Yokers and Cope met with plaintiff throughout 2011, repeatedly pressing her for information about her eye disease and the accommodations she required. When plaintiff finally provided the company with a doctor's note in June 2011, DirecTV promptly provided her with each of the accommodations her doctor requested. In short, DirecTV urges, the evidence establishes that "Yokers and the others in management responded in textbook fashion." While that is arguably *a* reasonable view of the evidence, it is not the *only* reasonable view. DirecTV's argument is essentially an

25

invitation to reweigh the evidence, something this court cannot do. If the evidence reasonably justifies the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (E.g., *Lobo v. Tamco* (2014) 230 Cal.App.4th 438, 442.)

### B. Disability Discrimination

"The FEHA makes it an unlawful employment practice '[f]or an employer, because of the . . . physical disability [or] mental disability, . . . of any person, . . . to bar or to discharge the person from employment, . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.' (§ 12940, subd. (a) (hereafter section 12940(a)).) Although section 12940 proscribes discrimination on the basis of an employee's disability, it specifically limits the reach of that proscription, excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties: "This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations." ' (*Green v. State of California* (2007) 42 Cal.4th 254, 262 (*Green*), quoting § 12940(a)(1).) Thus, '[i]n order to prevail on a discriminatory discharge claim under section 12940(a), an employee bears the burden of showing (1) that he or she was discharged because of a disability, and (2) that he or she could perform the essential functions of the job with or without accommodation (in the parlance of the [ADA], that he or she is a qualified individual with a disability). [Citation.]' (*Nadaf-Rahrov*, *supra*, 166 Cal.App.4th at p. 962; see also *Green*, at p. 262.)" (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 970-971.)

DirecTV contends that it was entitled to judgment on plaintiff's disability discrimination claim because there is no substantial evidence that the event that triggered plaintiff's termination—the August 30 on-air outage—was vision related. DirecTV

26

urges: "[Plaintiff's] error was unrelated to her disability. The company's action in discharging Salinda therefore could not possibly be discrimination."

We do not agree. Even assuming that the August 30 on-air outage was not vision related, there was abundant (albeit disputed) evidence that between December 2010 and August 2011, plaintiff made a significant number of errors attributable to her deteriorating vision. By DirecTV's own admission, these errors were *a* reason—even if not the *only* reason—that plaintiff received a verbal warning in July 2011 and was placed on a PIP in August 2011. The jury thus could reasonably have concluded that plaintiff was terminated not solely because of the August 30 outage, but because that outage followed an eight-month period in which plaintiff made an "alarming" number of errors for which she had been subject to discipline.

DirecTV also contends that even if plaintiff had been terminated for vision-related errors, such termination would not have been discriminatory because plaintiff had been reasonably accommodated. DirecTV urges: "[B]edrock disability law has required persons with disabilities to meet the employer's standards. Reasonable accommodations of course must be made (and the jury here expressly found that DirecTV made them). But once that occurs, nothing in the law requires an employer to overlook performance deficiencies, whether caused by a disability or otherwise."

We reject DirecTV's suggestion that because the jury returned a special verdict for defendant on plaintiff's reasonable accommodation claim, it had to find that plaintiff was not subject to disability discrimination. As we have said, the jury reasonably could have concluded that (1) plaintiff was reasonably accommodated at some points in time, but (2) plaintiff required *additional* accommodations—which she was not provided, and which led to the errors for which she was terminated—in late August 2011. Such findings amply support a finding of disability discrimination.

### C. Failure to Prevent Discrimination

Government Code section 12940, subdivision (k), prohibits an employer from failing "to take *all reasonable steps* necessary to prevent discrimination." (Italics added.) To prevail on a claim for failure to prevent discrimination, a plaintiff must establish three

elements: (1) he or she was subjected to discrimination, harassment, or retaliation; (2) the defendant failed to take all reasonable steps to prevent discrimination, harassment, or retaliation; and (3) the defendant's failure caused the plaintiff to suffer injury, damage, loss, or harm. (*Lelaind v. City and County of San Francisco* (2008) 576 F.Supp.2d 1079, 1103; see also CACI No. 2527.)

DirecTV urges that it was entitled to judgment on plaintiff's failure to prevent discrimination claim because no substantial evidence supported it. We do not agree. The record was replete with evidence that DirecTV failed to take reasonable steps to prevent discrimination, including the following:

Yokers, a DirecTV vice president and plaintiff's second-level supervisor, testified that he had never seen DirecTV's antidiscrimination policy, was not familiar with the terms "reasonable accommodation" or "interactive process," and had never been told that a disabled employee may be entitled to preferential consideration for a position as an accommodation for a disability.

John Ward, a DirecTV senior vice president and plaintiff's third-level supervisor, testified that he had never received any training from DirecTV as to how people with disabilities were to be treated, was not familiar with the terms "reasonable accommodation" or "interactive process," did not know what DirecTV's responsibilities to disabled employees were, and did not know who at DirecTV was responsible for making sure that DirecTV's antidiscrimination policies were followed.

Mona Dhillon, DirecTV's human resources representative, testified that she had never received any formal training concerning employees with disabilities, had only "some understanding" of the interactive process, did not recall whether she ever engaged in the interactive process with plaintiff, and did not know whether anyone else at DirecTV had ever done so.

DirecTV's opening brief does not discuss any of this evidence, but instead describes the evidence *it* believes demonstrates its reasonable steps to prevent discrimination company-wide. DirecTV notes that it adopted a nondiscrimination policy, maintained an ethics hotline, required its supervisory employees to undergo regular

28

antidiscrimination training, posted information about antidiscrimination laws in employee breakrooms, and had available sources to respond to discrimination. Further, DirecTV urges that it took reasonable steps to prevent discrimination against plaintiff, noting that Yokers and Cope changed the format of scheduling documents to assist plaintiff, encouraged plaintiff to advise the company if her eye issues were affecting her performance, sought plaintiff's doctor's guidance on necessary accommodations, and provided all the accommodations her doctor requested. This evidence, DirecTV urges, is "substantial evidence . . . [that] DirecTV took all reasonable steps on an institutional level to prevent discrimination in general, and also that it took all reasonable steps to prevent discrimination against Salinda in particular."

DirecTV's argument essentially asks us to reweigh the evidence and substitute our judgment for the jury's. We cannot do so. Instead, we determine whether, after resolving all conflicts and drawing all inferences most favorably to the prevailing party, there is substantial evidence to support the jury's verdict. (E.g., *Kelly v. CB&I Constructors, Inc.* (2009) 179 Cal.App.4th 442, 454; *Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465, disapproved on another ground in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 352, fn. 17.) The fact that the evidence might have supported a contrary finding does not warrant reversal.

## IV.

### There Was No Instructional Error Requiring a New Trial

DirecTV contends that the trial court should have granted a new trial because the jury was misinstructed on the issue of actionable disability discrimination. For the reasons that follow, DirecTV's contention is without merit.

Following the close of evidence, the jury was instructed consistent with CACI 2540 (Disability Discrimination—Disparate Treatment) and 2542 (Disability Discrimination—"Reasonable Accommodation" Explained) as follows:

"Noel Salinda claims that DirecTV wrongfully discriminated against her based on her actual or perceived disability (impaired vision). To establish this claim, Noel Salinda must prove all of the following:

29

"1.     That DirecTV knew of or treated Noel Salinda as if she had a physical condition that limited her ability to see and/or work;

"2.     That Noel Salinda was able to perform the essential job duties with reasonable accommodation for her actual or perceived disability (impaired vision);

"3.     That DirecTV terminated Noel Salinda or subjected her to other adverse employment action;

"4.     That Noel Salinda's actual or perceived disability (impaired vision) was a substantial motivating reason for DirecTV's decision to either terminate or take other adverse employment action against Noel Salinda;

"5.     That Noel Salinda was harmed; and

"6.     That DirecTV's conduct was a substantial factor in causing Noel Salinda harm."

"A reasonable accommodation is a reasonable change to the workplace that allows an employee with a disability to perform the essential duties of the job."

DirecTV concedes that these instructions correctly stated the law. It urges, however, the court should also have instructed that "A person with a disability must perform the job's essential functions. It is not disability discrimination if, following reasonable accommodation, an employer takes adverse action because a person with a disability cannot, or for any other reason fails to, fulfill a job's essential job functions." DirecTV concedes that it did not request such an instruction, but urges that the court had a duty to give the instruction sua sponte because "the court had an independent obligation to correctly instruct the jury on the law."

DirecTV's concession that it did not ask the trial court to give the "omitted" instruction is dispositive of its claim of instructional error. As our Supreme Court explained in *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131, by requesting the instructions the court gave and not requesting any additional instructions, a party forfeits the right to argue on appeal that the court misinstructed the jury: " ' " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no

30

duty to instruct on its own motion.' [Citations.]" [Citation.] Neither a trial court nor a reviewing court in a civil action is obligated to seek out theories plaintiff might have advanced, or to articulate for him that which he has left unspoken.' [Citation.] . . . Where, as here, "the court gives an instruction correct in law, but the party complains that it is too general, lacks clarity, or is incomplete, he must request the *additional or qualifying instruction in order to have the error reviewed*." [Citations.]' [Citation.] [A party's] failure to request any different instructions means he may not argue on appeal the trial court should have instructed differently. [Citations.]" (*Id.* at pp. 1130-1131; see also *Scofield v. Critical Air Medicine, Inc*. (1996) 45 Cal.App.4th 990, 1011 ["When a trial court 'gives a jury instruction which is correct as far as it goes but which is too general or is incomplete for the state of the evidence, a failure to request an additional or a qualifying instruction will waive a party's right to later complain on appeal about the instruction which was given. [Citation.]' "].)

DirecTV correctly notes that there is a limited exception to the rule that a court has no duty to instruct in the absence of a specific request by a party where there is "a complete failure to instruct on material issues and controlling legal principles." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 951, disapproved on another ground in *White v. Ultramar* (1999) 21 Cal.4th 563, 574, fn. 4.) No such failure appears here: As we have said, the court correctly instructed the jury concerning the elements of a disability discrimination claim and the legal meaning of "reasonable accommodations." Accordingly, DirecTV's failure to request additional instruction on disability discrimination forfeited the claimed instructional error.

## V.

## Attorney Fees

DirecTV urges that if we reverse the judgment in whole or in part, we must remand for the trial court to redetermine attorney fees. Because we instead affirm the portions of the judgment challenged by DirecTV, we do not reach the issue of attorney fees.

31

**PLAINTIFF'S CROSS-APPEAL**

Plaintiff's cross-appeal raises three issues: (1) Substantial evidence did not support the jury's verdict for DirecTV on the reasonable accommodations claim; (2) The trial court erred in granting summary adjudication of plaintiff's prayer for punitive damages; and (3) The trial court erred in granting summary adjudication of plaintiff's claim for wrongful termination in violation of public policy.

**I.**

**The Reasonable Accommodation Verdict**

**Was Supported by Substantial Evidence**

Under section 12940, it is an unlawful employment practice "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" unless the employer demonstrates doing so would impose an undue hardship. (§ 12940, subd. (m).) The essential elements of a failure to accommodate claim are: (1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability. (*Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1192.) "A reasonable accommodation is a modification or adjustment to the work environment that enables the employee to perform the essential functions of the job he or she holds or desires. [Citation.]" (*Nealy*, *supra*, 234 Cal.App.4th at p. 373.)

Plaintiff contends that the jury's reasonable accommodation finding—that DirecTV did not "fail to provide reasonable accommodation for [plaintiff's] disability"— is not supported by substantial evidence. We do not agree. There was evidence before the jury that even prior to receiving her doctor's note, Cope and Yokers reduced plaintiff's workload, changed the format of the scheduling documents to make them easier to read, and asked what else they could do to accommodate her. After plaintiff provided a doctor's note, DirecTV provided her with each of the accommodations her doctor requested. This evidence was sufficient to support the jury's finding that DirecTV did not fail to reasonably accommodate her.

32

Plaintiff urges that notwithstanding the accommodations just described, DirecTV did not "reasonably" accommodate her because it never provided her with a functional second monitor, did not offer her the position as Yokers' administrative assistant, and did not offer additional accommodations once it was evident that the initial accommodations were ineffective. Not so. As we have said, FEHA does not obligate an employer to choose the best accommodation or the specific accommodation sought by a disabled employee—it requires only that the accommodation chosen be "reasonable." (*Hanson v. Lucky Stores, Inc*. (1999) 74 Cal.App.4th 215, 228; § 12940, subds.(a) & (m).) The substantial evidence at trial supported the jury's finding that under the facts of this case, the accommodations provided plaintiff were reasonable.

## II.

## The Trial Court Erred in Summarily
## Adjudicating Plaintiff's Punitive Damages Claim

*A.        Summary Adjudication Standard of Review*

A defendant moving for summary judgment or summary adjudication "bears the burden of persuasion that there is no triable issue of material fact and [the defendant] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "To meet that burden, a defendant must show one or more elements of the cause of action cannot be established, or that there is a complete defense to that cause of action. (*Ibid*.; § 437c, subd. (p)(2).) To show the plaintiff cannot establish at least one element of the cause of action, the defendant must show 'the plaintiff does not possess, and cannot reasonably obtain, needed evidence.' (*Aguilar*, at p. 854.) If the defendant does not present sufficient evidence to meet its initial burden, the trial court must deny the motion for summary judgment or summary adjudication. (*Id*. at p. 850.)

"If the defendant meets its initial burden of production, the burden shifts to the plaintiff to set forth specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto. (*Aguilar*, *supra*, 25 Cal.4th at p. 849.) If the plaintiff meets that burden, summary judgment or summary adjudication should be

33

denied.  (*Gaggero v. Yura* (2003) 108 Cal.App.4th 884, 889.)  If not, summary judgment or summary adjudication for the defendant is appropriate.  (*Ibid*.)

"On appeal, we review the trial court's ruling on a motion for summary judgment or summary adjudication de novo, liberally construe the evidence in favor of the party opposing the motion, and resolve all doubts concerning the evidence in favor of the opposing party.  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.)  In so doing, we resolve all doubts regarding whether any triable issue of material fact exists in favor of the party opposing the motion for summary judgment or summary adjudication.  (*Barber v. Marina Sailing, Inc*. (1995) 36 Cal.App.4th 558, 562.)"  (*Guess v. Bernhardson* (2015) 242 Cal.App.4th 820, 825-826.)

### B.      Corporate Liability for Punitive Damages

Civil Code section 3294, subdivision (a) provides that punitive damages may be awarded "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Section 3294, subdivision (b) limits the liability of a corporation to acts ratified, authorized, or committed by a corporate officer, director, or managing agent.  (*Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1151.)

In *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566-567 (*White*), the Supreme Court explained that managing agents are "those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy."  "[T]o demonstrate that an employee is a true managing agent under [Civil Code] section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business."  (*White*, at p. 577.)  More recently, the court clarified that "[w]hen we spoke in *White* about persons having 'discretionary authority over . . . corporate policy' (*White*, *supra*, 21 Cal.4th at p. 577), we were referring to formal policies that affect a substantial portion of the company and that are the type likely to come to the attention of corporate leadership.  It is this sort of broad authority that justifies punishing an entire company for

34

an otherwise isolated act of oppression, fraud, or malice." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 714-715.)

" 'The scope of a corporate employee's discretion and authority under our [managing agent] test is therefore a *question of fact* for decision on a case-by-case basis.' ([*White*, *supra*, 21 Cal.4th] at p. 567, italics added.)  If there exists a triable issue of fact regarding whether a corporate employee is a managing agent under the *White* test, that factual question must be determined by the trier of fact and not the court on a motion for summary adjudication.  (§ 437c, subds.(c), (f); *Aguilar*, *supra*, 25 Cal.4th at pp. 856-857; cf. *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 63.)"  (*Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 366 (*Davis*).)

> C.      *Triable Issues of Material Fact Exist Regarding Whether Cope, Yokers, and/or Ward Were Managing Agents*

In *Davis*, *supra*, 220 Cal.App.4th 358, the plaintiff sued her former employer for discrimination, harassment, and retaliation in violation of FEHA.  Her complaint alleged that the employer's actions were malicious and oppressive and were committed and/or ratified by the employer's managing agents, and it included a prayer for punitive damages.  (*Id.* at pp. 361-362.)  The employer moved for summary adjudication of the punitive damages claim, asserting plaintiff could not recover punitive damages as a matter of law because no officer, director, or managing agent of the employer engaged in any oppressive, malicious, or fraudulent conduct against plaintiff.  The trial court granted the motion, and plaintiff appealed.  (*Id.* at p. 362.)

The Court of Appeal reversed.  It noted that in support of summary adjudication, the employer submitted the declarations of the two employees about whom plaintiff complained.  Preedy, the manager of the project on which plaintiff had worked, stated in his declaration as follows:  ". . . I am not an officer or a director of Kiewit.  As a Kiewit employee, I have never drafted corporate policy or had substantial discretionary authority over decisions that ultimately determine Kiewit's corporate policy.  The only role that I play with respect to Kiewit's anti-harassment and EEO [equal employment opportunity] policies is to ensure that they are followed on the job."  Lochner, the company's EEO

35

officer, submitted a similar declaration, as follows: ". . . As a Kiewit employee, I have never had substantial discretionary authority over decisions that ultimately determine Kiewit's corporate policy. I do not write or recommend implementation of any human resources policies and procedures." (*Davis*, *supra*, 220 Cal.App.4th at p. 367.)

The Court of Appeal concluded that these declarations did not satisfy the employer's summary judgment burden to make a prima facie showing of the nonexistence of triable issues of material fact. It explained: "[The employer] had the initial burden to produce sufficient evidence to make a prima facie showing that there were no triable issues regarding whether Preedy . . . (or any other . . . managers or employees involved in the incident) were managing agents of [the employer]. . . . However, the language [of Preedy's declaration] states a legal conclusion by simply parroting the *White*[, *supra*, 21 Cal.4th 563] standard. In *White*, the California Supreme Court stated 'managing agents' are employees who 'exercise[] *substantial discretionary authority over decisions that ultimately determine corporate policy*.' (*White*, *supra*, 21 Cal.4th at p. 573, italics added.) [Employer] cannot satisfy its initial burden of production of *evidence* by making a conclusory statement of *law*, whether directly or through a declaration of one of its employees . . . . [Employer] had the initial burden to produce sufficient *evidence* to make a prima facie showing that there was no triable issue regarding whether Preedy was a managing agent of [employer]. We conclude [employer], by simply restating the applicable legal standard under *White* for the determination of whether Preedy was its managing agent, did not satisfy its initial burden of production.

"Furthermore, to the extent [employer] also relies on Preedy's additional statements that he did not draft Kiewit's corporate policies and only ensured that its antiharassment and EEO policies were followed on the job, that statement was insufficient to satisfy [employer's] initial burden of production to make a prima facie showing that Preedy was not its managing agent. Preedy's declaration did not contain a sufficient description of his job duties and responsibilities and the nature and extent of his authority and discretion as the Project's manager, as well as his exercise of that authority

36

and discretion, to support a reasonable inference that he did not '*exercise*[] *substantial discretionary authority over* [*significant*] *aspects of* [*employer's*] *business*.' (*White*, *supra*, 21 Cal.4th at p. 577, italics added.) Accordingly, we conclude [employer] did not carry its initial burden of production to make a prima facie showing that Preedy was not its managing agent. Therefore, the trial court erred by concluding there was no triable issue of material fact whether Preedy was a managing agent of [employer]." (*Davis*, *supra*, 220 Cal.App.4th at pp. 369-370.) The court reached a similar conclusion as to EEO officer Lochner.

The present case is indistinguishable from *Davis*. In support of summary adjudication, DirecTV submitted the declaration of Anthony Cope, which stated in relevant part that Cope had been the Director of Traffic Operations since July 1999 and was the person responsible for the decision to terminate plaintiff. As Director of Traffic Operations, Cope supervised ten employees and "over[saw] the general activities of the Traffic Operations department and the managers within the department." However, Cope said he did "not affect corporate policy for the company. I have no discretion or independent authority over decisions that ultimately determine corporate policy and do not conduct core business activities for the company."

Subsequently, with its reply brief, DirecTV submitted the declarations of Ward and Yokers, which stated as follows:

*Ward*: "I am currently employed by DirecTV as the Senior Vice President of Production and Traffic Operations. I have held this position since April of 2011. In my capacity as Senior Vice President of Production and Traffic Operations, I do not affect corporate policy for the company. I have no discretion or independent authority over decisions that ultimately determine corporate policy and do not conduct core business activities for the company. The title of my position is functional, as I am not a corporate officer of DirecTV."

*Yokers*: "I am currently employed by DirecTV as the Vice President of the Traffic Department. I have held this position since 2002. In my capacity as Vice President of Traffic, I do not affect corporate policy for the company. I have no discretion or

independent authority over decisions that ultimately determine corporate policy and do not conduct core business activities for the company.  The title of my position is functional, as I am not a corporate officer of DirecTV."

Like Preedy's declaration in *Davis*, the declarations of Cope, Yokers, and Ward in the present case simply restate the legal standard under *White*.  The declarations do not contain sufficient descriptions of the individuals' job duties and responsibilities to support a reasonable inference that the declarants do not have "substantial discretionary authority over significant aspects of [DirecTV's] business."  Accordingly, DirecTV did not carry its initial burden to make a prima facie case that Cope, Yokers, and Ward were not managing agents, and the trial court erred by granting summary adjudication on this basis.

D.      *Triable Issues of Material Fact Regarding Malice, Fraud, or Oppression*

Having concluded that there are triable issues of material fact as to whether Cope, Yokers, and/or Ward are managing agents, we must reverse the summary adjudication of punitive damages unless we conclude there are no triable issues of fact as to whether any of these men acted toward plaintiff with malice, fraud or oppression.  (Civ. Code, § 3294, subd. (a).)  We do not so conclude.

"Malice" is defined in Civil Code section 3294 as conduct "which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." (Subd. (c)(1).)  Oppression is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  (Subd. (c)(2).) "The adjective 'despicable' used in section 3294 refers to 'circumstances that are "base," "vile," or "contemptible." ' (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725.)"  (*Cloud v. Casey* (1999) 76 Cal.App.4th 895, 912.)

We have already concluded that there is sufficient evidence to support the jury's determination that DirecTV intentionally discriminated against plaintiff on the basis of her disability.  Relying on the same evidence, a jury reasonably could conclude that by

38

terminating plaintiff because of her disability and then attempting to hide the illegal reasons for its decision with a false explanation, DirecTV acted in a way that was base, contemptible or vile, and in conscious disregard of plaintiff's rights. (See *Cloud v. Casey*, *supra*, 76 Cal.App.4th at pp. 911-912 [evidence supporting jury's determination that defendant intentionally discriminated against plaintiff because of her gender could also support award of punitive damages: "The jury could properly conclude that the [defendants] intentionally discriminated by denying Ms. Cloud a promotion based on gender, then attempted to hide the illegal reason for their decision with a false explanation, and that in this, they acted in a manner that was base, contemptible or vile. . . . Evidence that the decisionmaker attempted to hide the improper basis with a false explanation also supports the jury's determination that the conduct was willful and in conscious disregard of Ms. Cloud's rights."].)

Because there are triable issues of material fact as to plaintiff's punitive damages claim, we reverse the grant of summary adjudication on this issue.

### III.

### Wrongful Termination Claim

Plaintiff's counsel conceded at oral argument that even if the trial court erred in summarily adjudicating plaintiff's wrongful termination claim, a new trial is not warranted because any wrongful termination damages would be duplicative of the FEHA damages plaintiff has already recovered. We therefore do not consider on the merits whether there were triable issues of material fact as to plaintiff's wrongful termination claim.

**DISPOSITION**

The order granting summary adjudication is reversed to the extent it denied plaintiff's claim for punitive damages and the matter is remanded for further proceedings. In all other respects, the summary adjudication order and the judgment are affirmed. Plaintiff shall recover her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



LAVIN, J.



JONES, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

40