Filed 6/28/24  Hatcher v. City of El Segundo CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| WILLIAM HATCHER, | B327148 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. 21STCV37399) |
| CITY OF EL SEGUNDO, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Yolanda Orozco, Judge.  Affirmed.

Lipeles Law Group, Kevin A. Lipeles, Thomas H. Schelly and Julian Bellenghi for Plaintiff and Appellant.

Liebert Cassidy Whitmore, James E. Oldendorph and Victor D. Gonzalez for Defendant and Respondent.

————————————

# INTRODUCTION

In December 2019, at 64 and a half years of age, William Hatcher retired from the City of El Segundo (City) with approximately 27 years of service credit, having worked the last 19 of those years as a fire prevention specialist (FPS) for the El Segundo Fire Department (Department). A little over a year later, he filed an administrative complaint with the Department of Fair Employment and Housing (DFEH[1]) alleging City had failed to accommodate his knee disability and constructively discharged him because his workload had been increased to the point he was "eventually . . . unable to keep up with" it. After receiving a right to sue letter from DFEH, Hatcher sued City, asserting claims under the California Fair Employment and Housing Act (FEHA; Gov. Code,[2] § 12900 et seq.) for discrimination on the bases of age and physical disability, and for failure to accommodate a physical disability.

The trial court granted summary judgment to City. It found there was no triable issue as to whether Hatcher had been constructively discharged or suffered any other type of adverse employment action, and thus rejected his discrimination claims. The court found Hatcher's failure to accommodate claim was premised on City's actions in 2017, when Hatcher returned to work after knee surgery, and was therefore time-barred because

---

[1] DFEH was renamed the Civil Rights Department effective June 30, 2022, but we will refer to it as DFEH given that was its name during the relevant time period.

[2] All undesignated code references are to the Government Code.

Hatcher did not file his administrative complaint with DFEH until more than three years later, beyond the limitations period.

We affirm. Hatcher contends there are triable issues as to his constructive discharge theory, but he failed to adduce evidence from which a jury could reasonably find his work conditions were so intolerable that they could constitute a constructive discharge. Contrary to his allegation he was unable to keep up, the undisputed evidence showed Hatcher had no problems handling his assigned workload during his employment. Hatcher also contends there are triable issues with respect to his failure to accommodate claim, arguing he adduced evidence that City failed to reasonably accommodate him up through his retirement in 2019. But undisputed evidence shows that in April 2017, when Hatcher returned to work following knee surgery, he and his treating doctor denied any need for accommodation, and there is no evidence Hatcher sought or needed any accommodation after that time.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the evidence submitted by the parties in connection with City's motion for summary judgment. Unless otherwise noted, the facts are undisputed.

### A. Hatcher's Employment with the Department

Hatcher began working for the Department as an FPS in 2000. City Fire Marshal James Carver was Hatcher's direct supervisor from October 1, 2006, until Hatcher's retirement on December 30, 2019. Fire Chief Chris Donovan was Carver's direct supervisor during all relevant times.

Carver, Hatcher, and FPS Lisa Bruto were the only three employees in the Department's fire prevention division. They

3

performed annual fire inspections for commercial and multi-unit residential buildings, inspected new construction, reviewed technical plans, and conducted fire investigations. In conducting inspections, Hatcher had to engage in weight bearing activities such as walking, kneeling, squatting, and climbing step stools, ladders, and stairs.

## B. Hatcher's Knee Injuries

In 2011, Hatcher tore the meniscus in his left knee while working, made a worker's compensation claim, and received compensation.

On June 25, 2015, Hatcher tore the meniscus in his right knee while working. Hatcher made a worker's compensation claim for this injury.

On November 28, 2016, Hatcher had total knee replacement surgery on his right knee. After the surgery, Hatcher was on medical leave, during which he received his full salary and benefits.

## C. Hatcher Returns to Work After City Extends His Medical Leave for Several Weeks

On March 2, 2017, Hatcher's treating physician, Andrew Wassef, M.D., provided him with a return to work note with restrictions on kneeling/squatting, lifting, and climbing, and a requirement for a 30-minute stretch break every 10 hours. Hatcher testified that when he reported for work, Carver told him to go home, saying, "The chief said you have to go home. There's no light duty." Hatcher also testified he was told, "Come back when you're a hundred percent," which he understood came from Donovan. Hatcher went back on medical leave. Hatcher disputes that there was no light duty work he could have done in

4

March 2017, testifying he could have covered the counter, done plan checking, and answered phones.

On April 21, 2017, Dr. Wassef examined Hatcher and reported to City that Hatcher could return to work without any restrictions. On April 25, 2017, Hatcher, Donovan, Carver, City human resources manager Mayra Houston, Hatcher's worker's compensation case manager, and a union representative met regarding Hatcher's return to work. A memorandum of the meeting, prepared by Houston and signed by Hatcher, Carver, and Donovan, states in relevant part, "You [Hatcher] stated that you think you could perform your duties as assigned. The [D]epartment expressed concerns regarding your ability to fully and safely perform the duties assigned to you when you are out in the field as the [FPS]. Therefore, the City will proceed in scheduling you to participate in a fitness for duty examination (functional capacity evaluation)." After the meeting, Dr. Wassef ordered a functional capacity evaluation.

Pending the results of that evaluation, Hatcher was assigned to light duty.[3] Hatcher's responsibilities while on light duty were limited to completing paperwork and plan checks, and he was not out in the field completing inspections. He was able to take 15-minute breaks in the morning and afternoon and a one-hour lunch break during which he could walk and stretch his legs. During his time on light duty, Hatcher received his full pay and did not lose any benefits.

---

[3] Donovan and Carver averred in declarations that in March 2017 they concluded there was no light duty work for Hatcher to do, but the division's workflow changed over time and there was light duty work available in April 2017.

On May 11, 2017, City's disability compliance contractor, Rachel Shaw, contacted Hatcher about the functional capacity evaluation, and he told her he believed he could return to work without any restrictions. On May 12, 2017, Dr. Wassef submitted another report indicating Hatcher could return to work with no restrictions; Dr. Wassef noted that Hatcher "state[d] he is easily able to go up and down stairs and ladders now. It is only after a period of prolonged sitting that he has the stiffness and soreness." On May 17, 2017, Shaw sent a letter to Hatcher outlining the functional capacity evaluation process, and indicating that Hatcher had denied needing any restrictions or limitations on his work duties but City was pursuing an evaluation because it "remains concerned that due to your recent surgery, you may require additional recovery time and/or require additional work restrictions to support you in the short term before you are able to resume working your full duties." Shaw then scheduled a functional capacity evaluation with physical therapist Patrick Edgecomb, noting in her correspondence to Edgecomb, "Although Mr. Hatcher has been released full duties [*sic*] without restriction given the above most recent medical report received from Dr. Wassef, [City] remains concerned that he may have the need for additional restrictions/limitations in order to keep him safe at work and performing the full duties of his position."

On May 23, 2017, Edgecomb performed the functional capacity evaluation. Edgecomb concluded that Hatcher did not require any work restriction or accommodation. On June 6, 2017, Shaw sent a supplemental questionnaire to Dr. Wassef to review the results of the evaluation. On June 9, 2017, Dr. Wassef indicated he concurred with the evaluation's findings.

On June 12, 2017, Hatcher returned to work in his FPS position without any restrictions.

On June 16, 2017, Hatcher was provided with a "Disability Interactive Process:  Return to Full Duty Work Agreement" which he signed on June 20, 2017.  The agreement stated, in part, "I will notify my supervisor immediately if I suspect or believe that I may need accommodations in the future, or if I suspect or believe that any job activity is not safe for me to perform, is causing me pain or discomfort, or if I require additional leave from work," and "I understand if confronted with a job duty I am concerned about performing, or if I need leave again in the future, it is my responsibility to contact my supervisor and share my concerns immediately."

## D.  Hatcher Alleges He Is Assigned Too Many Inspections but His Actual Workload Is Much Lower

Hatcher testified that, up until 2017, he had always been required to perform about 300 annual inspections per year, but when he returned to work in June 2017, he was assigned 600 annual inspections.  Hatcher believed that his increased workload was "tied into [his] age, giving [him] a workload that was beyond what was normal for inspectors to have."  Based on statements by Carver, Hatcher was aware that Bruto was assigned 230 inspections.  Hatcher testified that, in the summer of 2017, "probably July," he told Carver that his workload was unreasonable but Carver declined to reduce it.

Carver, who was responsible for assigning annual inspections, denied that he increased Hatcher's assignments in June 2017.  Carver averred that he distributed the assignments equally between himself, Hatcher, and Bruto.  Carver further averred that Hatcher was never "assigned or expected to

7

complete 600 inspections per year subsequent to his return to full duty." Carver authenticated emails he sent to Hatcher and Bruto on January 31, 2018 and February 5, 2019, which indicated that each of the three would inspect seven high rise buildings during the respective year.

Beginning in June 2017, and continuing through 2019, the Department's annual inspection process was hampered by a transition to new iPad tablets. As explained by Carver, "The tablets would not properly sync with the Department's software which tracked fire inspections." As a result, Hatcher was not expected or required to complete the inspections assigned to him in 2017, 2018, and 2019.

According to Department records, from August 22 through December 31, 2017, Hatcher completed four annual inspections, Bruto completed 17, Carver completed 116, and other Department employees in other units completed 229.[4] During 2018, Hatcher completed 256 annual inspections, Bruto completed 206, Carver completed 138, and other Department employees completed 800. During 2019, Hatcher completed 37 annual inspections, Bruto completed 83, Carver completed 71, and other Department employees completed 338.

Hatcher was not disciplined in 2017, 2018, or 2019 for failing to perform enough annual inspections. Other than his discussion with Carver in about July 2017, Hatcher did not complain about his workload because he was not expected to complete his assignments due to the computer problems.

---

[4] Hatcher testified that not all inspections took the same amount of time, and sometimes multiple buildings were included in one inspection.

Hatcher testified, "if we weren't going to do the inspections, we had bigger—other things to worry about."

### E.   Carver, Donovan, and Other City Employees Mention Age and Retirement to Hatcher

When Hatcher returned to work on June 12, 2017, he was 61 years old.

Hatcher testified that Carver told him in some conversations during the period from Hatcher's return in June 2017 through 2019, "Hey, you're getting old.  Maybe you should retire."  Hatcher estimated that Carver asked him when he was going to retire about 45 times during this period.  Hatcher also testified that during the summer of 2017 Carver told him "a couple of times" something like, "It's a young man's job."

When Hatcher complained about his workload to Donovan at the end of June or early July 2017, Donovan said the job is for younger guys, or something similar.  Three or four times at the end of 2017 or beginning of 2018 Donovan said to Hatcher, "Maybe it's time to retire," or "it's time to retire.  You're not getting any younger."

Hatcher testified that, "maybe every other day," other City employees from various departments would ask him when he was going to retire.  Hatcher explained, "Especially with the economy and with all the cuts we have had, that just seemed to be the main topic.  Everybody was looking like when are they going to get out."  Asked whether he found this questioning from other City employees to be harassing, he responded, "Well, you know, I really hadn't planned on retiring.  But the way things were going, it just seemed, you know—I don't know.  It was getting overwhelming."

9

## F. Hatcher Retires

Hatcher retired on December 30, 2019. In a December 9, 2019 email announcing his retirement to Donovan, Hatcher wrote, "It's been a pleasure and an honor working for this and several other departments over the years. [¶] Thank you!!"

Hatcher testified, "If they would have got the computer issues fixed in 2020, 2021, I would have been doing those 600 inspections and probably written up if I didn't get them finished," but admitted he retired before he found out if this scenario would occur.

## G. Hatcher Submits a Complaint to DFEH and then Sues City

On January 28, 2021, Hatcher filed a complaint with DFEH which issued him a right to sue letter that same day. Hatcher sued City on October 12, 2021. In the operative first amended complaint, filed on May 23, 2022, Hatcher asserted FEHA claims for age discrimination (§ 12940, subd. (a)), physical disability discrimination (*ibid.*), and failure to accommodate a physical disability (*id.*, subd. (m)(1)).

Both the DFEH complaint and Hatcher's operative court complaint contended City should have allowed him to work light duty when he first returned to work after his November 2016 surgery, and should not have required light duty when Hatcher's doctor cleared him in April 2017 to work without restrictions. Hatcher alleged that, upon his return to his FPS position, his workload was doubled, and that he left his job with the Department because he was unable to keep up with this unreasonable and discriminatory workload. Hatcher asserted his retirement constituted a constructive discharge because his work environment became so hostile it would have compelled any

10

reasonable person to leave City's employ. Hatcher did not allege in either his DFEH complaint or the operative complaint in this case that his work circumstances were objectionable due to comments or discussions about retirement.

## H. City's Motion for Summary Judgment

City moved for summary judgment or, in the alternative, summary adjudication that each of Hatcher's claims failed based on the undisputed evidence and was barred because he had failed to timely file an administrative complaint with DFEH. City relied on declarations from Carver, Donovan, Shaw, its director of human resources, and its new fire chief, excerpts from Hatcher's deposition, and various documentary evidence.

City contended that Hatcher premised his claims on events taking place in 2017 that were time-barred because Hatcher failed to file an administrative complaint with DFEH within the one-year limitations period then in effect. City also contended that Hatcher's discrimination claims failed because he had not suffered any "actionable adverse employment action," including that he was not expected or required to complete the excessive number of annual inspections he claimed had been assigned to him and had not been disciplined in any way for completing fewer inspections. As to Hatcher's failure to accommodate claim, City contended it had reasonably accommodated Hatcher when he returned to work after his November 2016 knee surgery, and he did not request or require any accommodation after he was cleared for full duty in June 2017.

Hatcher opposed the motion, relying on additional excerpts from his deposition, evidence regarding claims by four other Department employees that Donovan had discriminated against them because of their age and/or disability, and deposition

11

excerpts from other lawsuits regarding a roster Donovan created which color-coded Department employees by their probable time to retirement. As relevant here, Hatcher contended that he based his discrimination claims on the theory his retirement in December 2019 was a constructive termination. Thus, Hatcher argued, those claims were not time-barred because just days after his retirement the applicable limitations period was increased to three years, and he filed his administrative complaint with DFEH just over a year later. Hatcher contended the evidence showed he was constructively terminated because of repeated questions and comments regarding his potential retirement and because he was assigned an excessive and disparate amount of annual inspections in 2017, 2018, and 2019.

Hatcher asserted his failure to accommodate claim was not time-barred because he requested to have his workload reduced due to knee problems up until the time he retired. He also asserted there was evidence City failed to reasonably accommodate him in March and April 2017, when he returned to work after his November 2016 knee surgery.

## I.    The Trial Court's Ruling

After hearing oral argument, the trial court granted summary judgment. As relevant here, the court concluded that Hatcher's failure to accommodate claim was time-barred because Hatcher did not seek any accommodation after 2017. As to the discrimination claims, the court concluded there was no triable issue as to whether Hatcher suffered an adverse employment action. Addressing Hatcher's constructive discharge theory, the court found there was insufficient evidence that Hatcher was forced to retire because of intolerable conditions at work. The court observed that it was undisputed Hatcher had not actually

12

been required to complete 600 inspections each year, and found that his speculation he would eventually be required to do so and be subject to some type of disciplinary action for failing to fulfill the requirement "is not evidence that an adverse employment [action] did in fact take place." The court also concluded that the alleged statements and questions to Hatcher about retirement "[did] not amount to an adverse employment action."

The trial court entered judgment in favor of City on February 3, 2023. Hatcher filed a timely appeal.

## DISCUSSION

### A. Standard of Review

"We review the trial court's decision de novo, considering all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476.) " 'We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206.)

"A defendant . . . has met his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto. The plaintiff . . . shall not rely upon the allegations or denials of its pleadings to show that a triable issue of material fact exists but, instead, shall set forth the

13

specific facts showing that a triable issue of material fact exists as to the cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(2).) A triable issue of material fact exists " ' "if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." [Citation.]' [Citations.]" (*Janney v. CSAA Ins. Exchange* (2021) 70 Cal.App.5th 374, 389-390.)

Finally, "[w]e . . . are not bound by the reasons in [the trial court's] summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Joshi v. Fitness Internat., LLC* (2022) 80 Cal.App.5th 814, 824.)

## B. Law Governing Hatcher's Claims

### 1. *FEHA Discrimination Claims*

Section 12940, subdivision (a) governs Hatcher's age and disability discrimination claims. It provides, in relevant part, that "[i]t is an unlawful employment practice . . . [¶] . . . [f]or an employer, because of the . . . physical disability . . . [or] age . . . of any person, to refuse to hire or employ the person . . . , or to bar or to discharge the person from employment . . . , or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." Claims brought under this provision " 'address[] only *explicit* changes in the "terms, conditions, or privileges of employment" [citation]; that is, changes involving some *official action taken by the employer*.' [Citation.] 'In the case of an institutional or corporate employer, *the institution or corporation itself* must have taken some official action with respect to the employee, such as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or benefits, or official disciplinary action.'

14

[Citation.]" (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 931-932.)

To establish a disability discrimination claim, Hatcher "must show (1) [he] suffer[ed] from a disability, (2) [he was] otherwise qualified to do [his] job, (3) [he] suffered an adverse employment action, and (4) the employer harbored discriminatory intent." (*Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1161; see *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1049 [the term " 'adverse employment action' . . . has become a familiar shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under a relevant provision of an employment discrimination statute"].) "On a motion for summary judgment brought against such a cause of action the plaintiff bears the burden of establishing a prima facie case of discrimination based upon physical disability, and the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action. Once the employer has done so the plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated. [Citation.]' [Citation.]" (*Faust v. California Portland Cement Co.* (2007) 150 Cal.App.4th 864, 886; accord, *Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 378.)

A prima facie case of age discrimination under FEHA, " 'arises when the employee shows that: (1) at the time of the adverse employment action, the employee was 40 years of age or

15

older; (2) some adverse employment action was taken against the employee; (3) at the time of the adverse action the employee was satisfactorily performing his or her job; and (4) the employee was replaced in his or her position by a significantly younger person. [Citations.]'  [Citation.]" (*Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 424.)  On summary judgment, if the employee establishes a prima facie case of discrimination, then the same type of burden shifting used in the disability discrimination context applies.  (*Id.* at pp. 425-426 [discussing *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 357-362].)

>    2.    *FEHA Failure to Accommodate Claims*

Section 12940, subdivision (m)(1) governs Hatcher's claim for failure to accommodate a physical disability and provides, in relevant part, "It is an unlawful employment practice . . . [¶] . . . to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee."

"A reasonable accommodation is a modification or adjustment to the work environment that enables the employee to perform the essential functions of the job he or she holds or desires.  [Citation.]  FEHA requires employers to make reasonable accommodation for the known disability of an employee unless doing so would produce undue hardship to the employer's operation.  [Citation.]  The elements of a reasonable accommodation cause of action are (1) the employee suffered a disability, (2) the employee could perform the essential functions of the job with reasonable accommodation, and (3) the employer failed to reasonably accommodate the employee's disability. [Citations.]" (*Nealy v. City of Santa Monica, supra*, 234 Cal.App.4th at p. 373.)

16

3.    *The Applicable Limitations Period*

Employees cannot pursue a FEHA claim in court until they have filed an administrative complaint with DFEH and received a right to sue letter.  "Exhaustion of these procedures is mandatory; an employee may not proceed in court with a FEHA claim without first obtaining a right-to-sue letter." (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 106.)  Aside from exceptions not relevant here, during the time Hatcher was employed by City FEHA required an employee to file an administrative complaint with DFEH within one year after "the date upon which the alleged unlawful practice or refusal to cooperate occurred."  (Former § 12960, subd. (d).)  "This requirement [was] '[t]he statute of limitations for FEHA actions.' [Citation.]"  (*Pollock v. Tri-Modal Distribution Services, Inc.*, *supra*, 11 Cal.5th at p. 931.)[5]

Effective January 1, 2020, this period was extended to three years.  (§ 12960, subd. (e)(5); Stats. 2019, ch. 709, § 1 [adding former § 12960, subd. (e)].)  "As long as the former limitations period has not expired, an enlarged limitations period ordinarily applies and is said to apply prospectively to govern cases that are pending when, or instituted after, the enactment took effect. . . .  [¶]  . . . [¶]  However, when it comes to applying amendments that enlarge the limitations period to claims as to which the limitations period has expired before the amendment became law—that is, claims that *have lapsed*—the analysis is

---

[5] If, as occurred here, DFEH issues a right to sue letter, the claimant has one year to file their civil action.  (§ 12960, subd. (f)(1)(B).)  There is no dispute that Hatcher filed his lawsuit within a year of DFEH's right to sue notice.

17

different.  Once a claim has lapsed (under the formerly applicable statute of limitations), revival of the claim is seen as a retroactive application of the law under an enlarged statute of limitations. Lapsed claims will not be considered revived without express language of revival." (*Quarry v. Doe I* (2012) 53 Cal.4th 945, 957.)  The act extending the FEHA limitations period to three years declares that it "shall not be interpreted to revive lapsed claims." (Stats. 2019, ch. 709, § 3.)

## C.    Hatcher's Discrimination Claims Fail

To establish a prima facie case for both his disability and age discrimination claims, Hatcher had to show City took an adverse employment action against him.  (§ 12940, subd. (a); *Arnold v. Dignity Health*, *supra*, 53 Cal.App.5th at p. 424; *Faust v. California Portland Cement Co.*, *supra*, 150 Cal.App.4th at p. 886.)  To satisfy this element, Hatcher relies solely on his retirement, which he contends was in reality a constructive discharge resulting from intolerable work conditions.

"Constructive discharge occurs only when the employer coerces the employee's resignation, either by creating working conditions that are intolerable under an objective standard, or by failing to remedy objectively intolerable working conditions that actually are known to the employer." (*Mullins v. Rockwell Internat. Corp.* (1997) 15 Cal.4th 731, 737.)  As our high court has explained, the rationale of the constructive discharge theory is to preclude an employer from avoiding potential liability for wrongful termination by not taking the formal action of "firing an employee" and instead "engag[ing] in conduct causing him or her to quit." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244 (*Turner*).)  "Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the

18

employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation. [Citation.]" (*Id.* at pp. 1244-1245.)

That said, "an employee cannot simply 'quit and sue,' claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Turner*, *supra*, 7 Cal.4th at p. 1246.) Thus, "to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Id.* at p. 1251.)

"[T]he standard by which a constructive discharge is determined is an objective one—the question is 'whether a reasonable person faced with the allegedly intolerable employer actions or conditions of employment would have no reasonable alternative except to quit.' [Citation.]" (*Turner*, *supra*, 7 Cal.4th at p. 1248.) Whether conditions were so intolerable as to justify resignation is normally a question of fact, but "in some situations a court may conclude as a matter of law that a reasonable employee would not have felt compelled to resign" and "[i]n such situations, summary judgment is proper." (*Kovatch v. California Casualty Management Co.* (1998) 65 Cal.App.4th 1256, 1267,

19

disapproved on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19.) Furthermore, where the alleged intolerable conditions were not created by the employer, the employer must have actual notice for liability to be imposed. (*Turner, supra,* at pp. 1248-1249.) This "require[s] employees to notify someone in a position of authority of their plight, [thereby] permit[ting] employers unaware of any wrongdoing to correct a potentially destructive situation." (*Id.* at p. 1250.)

Hatcher contends that he was constructively discharged based on evidence (1) he was assigned 600 annual inspections in 2017, 2018, and 2019, which he asserts was excessive and more than other employees were assigned, (2) Carver and Donovan made comments about retirement and said that the FPS job was for young people, and (3) other City employees frequently asked Hatcher about retirement. We conclude that this evidence is insufficient to create a triable issue of fact that conditions were so intolerable that they would have compelled a reasonable employee to resign.

First, the undisputed evidence shows that Hatcher was never actually expected or required to complete 600 annual inspections. At the direction of his superiors, Hatcher completed fewer inspections than he was assigned and there is no evidence he was ever threatened with discipline for failing to complete more inspections. More importantly, Hatcher conceded that he had no reason to complain about his workload because he was able to handle it. Hatcher testified about his concern that he would *eventually* be required to complete 600 annual inspections and might be disciplined for failing to meet the requirement at some point in the future, but there is no evidence that his subjective fears were reasonable, much less that the scenario he

20

feared was imminent or unavoidable, at the time of his resignation. (See *Simers v. Los Angeles Times Communications LLC* (2018) 18 Cal.App.5th 1248, 1272 [in evaluating a claim of constructive discharge, " 'the proper focus is on the working conditions themselves, not on the plaintiff's *subjective* reactions to those conditions' "].)

Turning to comments about retirement, Hatcher testified that Donovan commented about retirement on three or four occasions in late 2017 and early 2018, and said that the FPS job was for younger guys or something similar once in the summer of 2017. No reasonable trier of fact could find these isolated comments created intolerable working conditions in December 2019 when Hatcher retired. (See *Turner*, *supra*, 7 Cal.4th at p. 1255 [collecting cases holding that a meaningful passage of time after the purportedly unbearable conditions arose until resignation indicates that neither the plaintiff nor a reasonable employee would have regarded working conditions as intolerable].)

We recognize that Hatcher asserts his direct supervisor Carver made similar comments on a more frequent basis. Hatcher estimated that from when he returned to work in June 2017, until his retirement at the end of 2019, Carver asked him when he was going to retire about 45 times. He also testified that Carver said something like "It's a young man's job" about the FPS position "a couple of times" in the summer of 2017. No reasonable trier of fact could find that these questions and comments made Hatcher's situation at work so unpleasant that he had no realistic option other than to retire. The question here is not whether these comments were discriminatory, "but whether the discriminatory working conditions were so extreme

as to coerce a reasonable employee to resign." (*Cloud v. Casey* (1999) 76 Cal.App.4th 895, 905.) Although these comments may have angered or upset Hatcher, there is no evidence they were physically threatening or humiliating, as opposed to mere offensive utterances, or that they interfered with Hatcher's work performance. (See *Yanowitz v. L'Oreal USA, Inc.*, *supra*, 36 Cal.4th at pp. 1054-1055 [describing factors applicable to adverse employment action]; *Cornell v. Berkeley Tennis Club* (2017) 18 Cal.App.5th 908, 940 [describing factors applicable to a hostile work environment].) Hatcher presented no evidence regarding the circumstances under which Carver asked when he was going to retire, much less any evidence that Carver asked in a critical or threatening manner or suggested that there would be repercussions if Hatcher did not retire. Furthermore, to the extent Hatcher felt the questions were critical of his job performance, "Criticism of an employee's job performance, even ' "unfair or outrageous" ' criticism, ' "does not create the intolerable working conditions necessary to support a claim of constructive discharge." ' [Citation.]" (*Simers v. Los Angeles Times Communications LLC*, *supra*, 18 Cal.App.5th at p. 1272.) No reasonable fact-finder could conclude Carver's alleged comments created an unbearable work environment that necessitated Hatcher's resignation.

Finally, Hatcher testified that other City employees asked him when he was going to retire "maybe every other day." However, according to Hatcher's own testimony, these questions came up in general conversation about retirement, which was "the main topic" among City employees because of the economy and conditions at work common to all of City's workforce, and were not targeted only at him or people like him. Hatcher

22

testified he felt "overwhelmed" by these comments, but that subjective reaction is not to be reasonably anticipated and is insufficient to support a constructive termination claim. (*Turner, supra*, 7 Cal.4th at p. 1248 [whether conditions are intolerable is measured objectively].) Furthermore, there is no evidence that City was aware of these comments or the allegedly intolerable conditions they created.[6] (*Id.* at pp. 1248-1249 [for constructive discharge based on conditions not created by the employer, the employer must have actual knowledge for liability to be imposed].)

Hatcher argues there is a triable issue whether he was constructively discharged because he "produced evidence that he was subject to a continuous course of conduct over a period of years." While a continuous course of conduct can support a constructive termination claim under *Turner*, the course of conduct must create " 'adverse working conditions . . . so intolerable that any reasonable employee would resign rather than endure such conditions.' [Citation.]" (*Turner, supra*, 7 Cal.4th at p. 1247; see *Cloud v. Casey, supra*, 76 Cal.App.4th at p. 903 [concluding the plaintiff's evidence of "a chain of events occurring over a six-year period" leading up to her being denied a promotion did not show "working conditions . . . so aggravated or intolerable that a reasonable person in [the plaintiff's] position would be compelled to resign"].) When the alleged increased workload and retirement-related comments are considered all

---

[6] Hatcher asserts in his briefing that he complained to Carver about the questions from other City employees, and he reiterated this claim at oral argument, but the evidence he cites does not support his assertion.

23

together, no reasonable trier of fact could find Hatcher was subject to such intolerable conditions in this case. Hatcher fails to cite any case finding grounds for a constructive discharge claim under circumstances like those at issue here, and his citations to *Valdez v. City of Los Angeles* (1991) 231 Cal.App.3d 1043 and *Nolan v. Cleland* (9th Cir.1982) 686 F.2d 806 are inapposite as neither case presents similar facts.[7]

Given our conclusion that Hatcher failed to present a triable issue whether City took any adverse employment action

---

[7] In *Valdez v. City of Los Angeles*, *supra*, 231 Cal.App.3d 1043, the plaintiff police officer claimed he had been repeatedly denied a promotion. (*Id.* at p. 1049.) The court found he had adequately pleaded a constructive discharge claim by alleging the police department's promotion process discriminated against Hispanics such as himself, and he was "depriv[ed] of training opportunities, ha[d] to meet a higher standard of performance than non-Hispanics, and [was] deni[ed] assignments which could have led to advancement opportunities." (*Id.* at p. 1057.) In *Nolan v. Cleland, supra*, 686 F.2d 806, the court found the plaintiff, a Veterans Administration (VA) researcher, had raised a triable issue as to her constructive termination claim based on evidence VA officials denied her application for an advancement program based on her marital status, an equal employment opportunity (EEO) investigator found the denial had been discriminatory, and VA officials then thwarted the plaintiff's attempts to obtain assignments she applied for and instead placed her in an unsuitable assignment she had not requested, which assignment was found by an EEO process "to have been made for discriminatory-retaliatory purposes." (*Id.* at pp. 807-810, 813-814.) As the court summarized, "[the plaintiff's] VA career was punctuated with numerous adjudicated instances of discrimination which culminated in her departure from the VA." (*Id.* at p. 813.)

24

against him, his discrimination claims fail, and his arguments that there was evidence of unlawful animus are therefore irrelevant.  For example, evidence regarding discrimination claims asserted by other Department employees is immaterial because it could only be relevant to discriminatory intent, which is not sufficient in and of itself to support a discrimination claim in the absence of an adverse employment action.  The employee roster Donovan created is similarly irrelevant.  With regard to his constructive termination claim, there is no evidence that Hatcher was aware of the roster.  To the extent that Hatcher contends the roster showed Donovan's discriminatory animus, it is irrelevant for the reasons just discussed; to be relevant in a case such as this, evidence of discriminatory animus must be coupled with evidence of an adverse employment action.

Lastly, *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, upon which Hatcher relies, is inapposite.  In *Reid*, there was no question that, by being terminated from employment, the plaintiff had suffered an adverse employment action.  (*Id.* at p. 519.)  Thus, unlike in this case, the plaintiff's claims of discriminatory animus were relevant.  In the portion of the *Reid* opinion Hatcher cites, the court addressed what type of evidence could be used to demonstrate such animus, and its holding has no application here given our conclusion that Hatcher failed to raise a triable issue as to whether he was subjected to an adverse employment action.

## D.     Hatcher's Failure to Accommodate Claim Is Time-barred

The only evidence that Hatcher sought an accommodation for his knee problems was that he wanted to work light duty in March 2017, when Dr. Wassef cleared him to work with

restrictions. City did not provide light duty work but did extend Hatcher's medical leave with full pay and benefits. We need not decide whether City's approach could constitute a failure to accommodate because these events took place well beyond the statute of limitations. At that time, the limitations period was one year, so to be timely Hatcher had to file his administrative complaint with DFEH in 2018, but he did not file it until January 2021.[8]

Hatcher does not argue that his administrative complaint was timely with respect to the 2017 events. Instead, he contends there was evidence he "repeatedly requested accommodations" for his knee problems from 2017 through his retirement. This contention is not supported by the record.[9] Hatcher adduced no evidence that he requested any type of accommodation later in 2017, or in 2018 or 2019. Indeed, Hatcher conceded at his deposition that he did not request any accommodation after 2017.

---

[8] Hatcher also contends he requested an accommodation in in the summer of 2017, "probably July," when he told Carver that his workload was unreasonable. However, there is no evidence that Hatcher sought any accommodation at that time due to any disability. Instead, he claimed he was fully fit for duty in summer 2017 and that City discriminated against him by giving him light duty rather than full duty. Regardless, there is no evidence that Hatcher complained about his workload at any time after July 2017, so any such accommodation claim would be time-barred.

[9] None of the evidence Hatcher cites in his briefing, including evidence his counsel referenced at oral argument, suggests that Hatcher made any request for accommodation after 2017.

Hatcher argues that, even if he did not request one, City had an affirmative obligation to offer him a reasonable accommodation such that his claim is not time-barred.[10] This argument fails because there was no evidence City was aware Hatcher needed any accommodation or that Hatcher had any difficulty performing his work responsibilities after returning to full duty in June 2017. Furthermore, as noted, Hatcher insisted he was fully fit for duty in June 2017, and this was the conclusion reached by Dr. Wassef and the physical therapist who conducted the functional capacity evaluation. There is no evidence that Hatcher's condition deteriorated, much less that City was aware of such a fact. In addition, Hatcher agreed in June 2017 that he would notify City if he had any need for an accommodation, but he never did so.

*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, upon which Hatcher relies, is inapposite because the airline employer in that case was aware that the two pilot plaintiffs were unable to perform their jobs because it had grounded them due to health issues. (*Id.* at pp. 942-944.) Hatcher cites *Faust*, but the court there only held that, for purposes of the plaintiff's disability discrimination claim, there was evidence the employer knew of his disability by learning of it from the plaintiff's chiropractor. (*Faust v. California Portland Cement Co., supra,* 150 Cal.App.4th

---

[10] As City points out, Hatcher did not assert this legal theory in opposing City's summary judgment motion. Whether to consider this issue of law raised for the first time on appeal lies within our discretion. (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 767.) We exercise our discretion to consider Hatcher's new theory, as it is based on the evidence presented to the trial court on summary judgment.

at pp. 870, 887.)  Hatcher also cites *Zamora v. Security Industry Specialists, Inc.* (2021) 71 Cal.App.5th 1, but in that case the defendant employer was aware the plaintiff employee had suffered an injury which initially prevented him from working at all, and he was never cleared to return to work without restrictions.  (*Id.* at pp. 17-23.)  *Zamora* is also inapplicable because the appeal did not address the plaintiff's failure to accommodate claim, which was dismissed before the appeal.  (*Id.* at p. 28.)

Hatcher relies on evidence that he slipped on cardboard during one inspection in 2018, which "re-aggravated" his left knee and caused him to sit down when filling out paperwork, and Carver and Donovan were aware of the incident.  But this does not show a triable issue that Carver or Donovan knew that Hatcher suffered from chronic or on-going problems with his knees or otherwise needed accommodation.  In fact, according to Hatcher, he told Carver that all he needed was to "go home and put some ice on it."  There is no evidence that Hatcher had any problems performing his work as a result of this incident other than on the day it occurred.  In any event, any claim based on this incident lapsed in 2019 under the one-year limitations period then in effect and is therefore time-barred.

**DISPOSITION**

The judgment is affirmed.  As we do not find Hatcher's appeal was frivolous, unreasonable, or groundless, the parties are to bear their own costs on appeal.  (§ 12965, subd. (c)(6); *Pollock v. Tri-Modal Distribution Services, Inc.*, *supra*, 11 Cal.5th at pp. 950-951.)

NOT TO BE PUBLISHED


                                        WEINGART, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.